## HALLER, Appellant, v. CITY OF ST. LOUIS.

### Division One, July 2, 1903.

1. **Negligence: REPAIRING STREET: STEAM ROLLER: FLAGMAN.** Plaintiff's horse became frightened at a steam roller which was being used in repairing defendant's street, and jumped and threw her out of the buggy, and she charges the city with negligence in failing to have a flagman to warn her of the approach of the roller. *Held*, that, as the street was straight and she knew the repairs were going on and that the steam roller was being used, and saw the roller six hundred feet before she got to it, this assignment of negligence becomes unimportant and immaterial, for having personal knowledge of all the flagman could have told her, the absence of a flagman could not be the proximate cause of her accident.

2. ————: ————: SIDE ROAD. Whether or not a summer or dirt road along the side of a macadam street is a part of the street

on which the city's steam roller, which scared plaintiff's horse, causing her injury, was at work, and had been purposely left open by the city's servants for people to pass along, is a question for the jury, and there being substantial evidence to support their finding, the court will not interfere.

3. ——— : ——— : ——— : CONTRIBUTORY NEGLIGENCE. But even if the dirt road was a part of the street, whether or not plaintiff was guilty of contributory negligence in driving by the steam roller on the street, is a question for the jury.

4. ——— : ——— : ——— : CORRECT THEORY : FINDING OF JURY. Where the case goes to the jury upon the only act of negligence charged in the petition, to-wit, the act of the servants of the city in allowing or causing steam to escape from a roller being used in repairing the street, and make a loud noise and scare plaintiff's horse as she, in the exercise of ordinary care, was passing along the street, and the jury finds for the city, that verdict must mean that no such steam was allowed to escape and no such noise was made, and the verdict must be affirmed if there is substantial evidence to support it. Even though it be true that the plaintiff had a right to pass along the street while it was being repaired, and even though the city had no right to withdraw the street from use temporarily while it was being repaired, and even though the summer or dirt road constituted a part of the street and was left open for travel by the city, which thereby invited people to drive along there while the street was being repaired, yet whether or not plaintiff was nevertheless guilty of contributory negligence in driving there, was a question for the jury.

5. ——— : CLOSING STREET. An ordinance vesting in the mayor and street commissioner the power to temporarily close a street for repairs, is a mere police regulation and is valid. It is not a delegation of legislative power.

Appeal from St. Louis City Circuit Court.—*Hon. Jacob Klein*, Judge.

AFFIRMED.

*Johnson, Houts, Marlatt & Hawes* for appellant.

(1) By the charter of St. Louis, the power to con-struct and repair streets is one which must be exercised by the mayor and assembly by ordinance. The power to close streets is derived from the power to construct

and repair streets. These powers can not be delegated by the mayor and assembly to the mayor and street commissioner. City v. Russell, 116 Mo. 255; City v. Clemens, 43 Mo. 395; Thompson v. Boonville, 61 Mo. 282; Birdsall v. Clark, 73 N. Y. 73; Cromwell v. Bristol, 20 L. R. A. 653. (2) Much less could the mayor and street commissioner delegate the power to close streets to a foreman in charge of street repair work. (3) Under defendant's own testimony, that part of the street on which plaintiff was at the time of the accident was not closed, and it was error on the part of the court to permit the reading to the jury of the ordinance authorizing the closing of a street and making it a misdemeanor for persons to drive upon a street which was closed. It is reversible error to permit the introduction of irrelevant testimony which may wrongfully influence the jury. Weil v. Poston, 77 Mo. 284; Baker v. Stonebroker's Admrs., 36 Mo. 338; State v. McCanon, 51 Mo. 160. (4) There was no negligence shown on the part of the plaintiff, and it was error to submit the question of contributory negligence to the jury. 1 Thompson on Negligence, sec. 459; Goltz v. Griswold, 113 Mo. 144; Market v. St. Louis, 56 Mo. 189; Beach on Contributory Negligence, sec. 247; Winter v. Banks, 72 Ala. 411; Combs v. Purrington, 42 Mo. 365; County Commissioners v. Broadwater, 69 Mo. 533; Harris v. Township, 64 Mich. 447; Evans v. Railroad Co., 106 Mo. 601; Knight v. Goodyear, etc., 38 Conn. 438.

*Charles W. Bates* and *Carl Ungar* for respondent.

(1) (a) The city is by law required to keep its streets in a reasonably safe condition, and to that end is authorized to cause the same to be reconstructed, repaired and maintained. (b) "The street commissioner shall have under his special charge the construction, reconstruction, repairing and cleaning of the public streets, alleys and places, excepting parks." Charter, art. 4, sec. 35.

(c) The municipal assembly may employ officers and agents to perform the ministerial, administrative and executive functions of carrying out the work ordered, and may vest in them discretionary powers as to details. St. Louis v. Meyrose, etc., Co., 139 Mo. 560; St. Joseph to use v. Owen, 110 Mo. 455; Sheehan v. Gleason, 46 Mo. 104. (2) The use on the streets of such an appliance as a steam roller for the purpose of constructing or repairing said streets, is a lawful method of performing the duty imposed by law by the city of St. Louis for constructing and repairing streets. District of Columbia v. Moulton, 182 U. S. 579. (3) Upon the evidence that the steam roller was being used in the work on the street, and was not at or before the accident to plaintiff making any unusual noise, and that the plaintiff had not only known for weeks that the steam roller was being so used but saw it on the occasion of the accident, some time before the accident, i. e., it least five or six hundred feet before she reached it, the court was justified in giving the instruction on contributory negligence, and the verdict in favor of the defendant should not be disturbed. District of Columbia v. Moulton, 182 U. S. 576. (4) The ordinance respecting the closing of the street was properly admitted in evidence. (a) The general welfare clause of the charter authorizes their enactment. Charter, art. 3, sec. 26, par. 14; St. Louis v. Meyrose, etc., Co., 139 Mo. 560. (b) The closing of the street is incident to, and included in, the authority to make and repair streets. Stevens v. Macon, 83 Mo. 356. (c) The ordinance authorizing the street to be closed by the administrative officers was not a delegation of legislative power, and the leaving of the actual placing of the sign on the street by the street department to officers and employees of the department where work was being done was not a delegation of the discretionary powers of the street commissioner and mayor. (d) The ordinances in question not forming the basis or foundation of the

Vol 176 mo—39

action or defense, it was not necessary to their admission in evidence that they be pleaded. Robertson v. Railroad, 84 Mo. 121. (e) The ordinances are admissible on the ground that they showed the authority for the placing of the street-closing signs, thus giving warning to all passers-by. (5) But even if the ordinances were not admissible, it was not reversible error to admit them, as plaintiff saw the street-closing signs and knew what they meant, and saw the work being done on the street, and saw and knew that the steam roller was at work, and the ordinances could not have prejudiced her case. Sallee v. St. Louis, 152 Mo. 622.

MARSHALL, J.—This is an action for ten thousand dollars damages for personal injuries sustained by the plaintiff on May 11, 1898, on Broadway, opposite Bellefontaine Cemetery, and caused, it is alleged, by the negligence of the servants of the city permitting an unusual amount of steam and smoke to escape from a steam street roller that was being used at that point in repairing the street, thereby making a loud noise, scaring the gentle horse that plaintiff was driving to a light spring wagon, and causing him to run away, turn the wagon over down an embankment, and injure the plaintiff. There was a verdict and judgment for the defendant, and after proper steps the plaintiff appealed.

The negligence charged in the petition is the failure to have a flagman to warn the plaintiff of the approach of the roller, and in allowing or causing the steam to escape and make a loud noise, and thereby scare the plaintiff's horse.

The answer is a general denial and a plea of contributory negligence.

Broadway, at the place of the accident, is sixty feet wide. There is no made sidewalk on either side. On the west side of the street there is a double street railway. From the street car tracks eastwardly the street is macadamized, making an improved street about forty

feet wide.   East of the east line of the street, but not forming a part of the street, is what is termed a "summer road."   It is unimproved and is used by vehicles in dry weather.   It is higher than the grade of the street.   On the east of the summer road the land lies below the grade of the summer road, and below the grade of the street.   To the east of the summer road the land slopes for about ten feet to a barbed wire fence.

For several weeks before the accident the city had been engaged in the work of repairing Broadway, by putting in new macadam, which was smoothed and crushed with a roller.   At first a horse roller was used, but about two weeks before the accident, a steam roller was substituted and was used thereafter.   A block at a time was thus repaired.   Some of the blocks were very long, being seven or eight hundred feet long.   While the work was being done the street was temporarily closed.   This was done by placing a "street closed" sign at either end of the block.   The "street closed" sign consisted of a notice printed on white paper and attached to a stand about two and a half to three feet high, and a small red flag at the top of the stand.

The notice and the city ordinance recited therein were as follows:

"STREET CLOSED.

"This street is temporarily withdrawn from public use by authority of Revised Ordinances of 1892, section 565.   The street commissioner is authorized with the approval of the mayor to close any street, alley, public place or highway and withdraw the same from public use temporarily, and during such period as public work thereon shall make such action necessary, any person using or attempting to use said street, alley, public place or highway so withdrawn from public use, or driving or attempting to drive any animal or vehicle thereon, shall be deemed guilty of a misdemeanor and on conviction

thereof shall be fined not less than ten dollars nor more than fifty dollars for each offense.

"Section 566. It shall be the duty of the police within their respective districts to watch for and arrest persons violating the provisions of the above section.

"By order of

"A. N. MILNER, Street Commissioner.

"Approved: HENRY ZIEGENHEIN, Mayor."

The plaintiff lived in Woodlawn, about three or four miles north of the place of accident. She had been in the habit of coming to the city two or three times a week to sell vegetables, butter, milk, cheese and other farm products. Her customers lived, generally, on Broadway south of the place where the accident occurred. She says she knew no other way to get to town, but she admits she knew that Calvary avenue runs west from Broadway between Bellefontaine and Calvary cemeteries (which was north of the place of the accident), and the other evidence in the case, on both sides, shows that Calvary avenue goes to Florissant avenue and that Florissant avenue runs north and south just as Broadway does, and almost parallels Broadway at that point, and is perhaps not over half a mile west of Broadway, and that it also furnishes access to the city to the farmers living north of the city.

The plaintiff knew that the city was repairing Broadway and had seen the work progressing, the "street closed" signs used as aforesaid, and also the horse roller and the steam roller. She drove a gentle horse that had been worked around a lumber yard in the city where the steam railroad cars were constantly passing, and he was not afraid of the steam or noise or whistle of such cars. For two weeks before the accident the plaintiff had passed the steam roller in use on Broadway two or three times each week, and the horse showed no signs of fear. On the day of the accident she approached the block where the street repairs were in progress, from the north. She was driving in the

street car track on the west side of Broadway.   When she got within about one hundred and fifty feet of the "street closed" sign she saw the steam roller just south of the sign.   It was either standing still or moving very slowly.   She turned off of the car tracks and drove onto the summer road, and proceeded southwardly.   When she got about opposite the steam roller her horse became suddenly frightened and unmanageable, and gave two or more jumps, and turned the wagon over down the incline on the east side of the summer road, ran into the barbed wire fence, threw the plaintiff out of the wagon and injured her.

There is a direct, sharp and irreconcilable conflict in the evidence upon the question of the negligence charged against the defendant.

The plaintiff's evidence is that neither she nor her witnesses saw a flagman before the accident and that no warning was given to her of the approach of the roller. The defendant's testimony shows that there was a flagman regularly employed, who always went about a hundred feet ahead of the roller and waved his red flag when a vehicle was approaching and that the roller was stopped if the horses showed evidences of fear, and that the roller was stationary and the flagman there at and before the time of the accident, and that when the horse showed signs of fright the "straw-boss" went to him and caught him by the bridle, but the horse broke loose from him and ran away and turned the wagon over.

It is conceded by the plaintiff, however, that she knew that the repairs were going on, that the steam roller was being used, that the street was straight, and that she saw the roller six hundred feet before she got to it, and turned off of the street about a hundred and fifty feet north of the roller.   Hence, having personal knowledge of the presence of the roller, this assignment of negligence becomes unimportant and immaterial, for she knew all that a flagman could or was intended to

tell her of, and therefore the failure to have a flagman, if such was the fact, could not be the proximate, or even the remote, cause of the accident.

The evidence is also irreconcilably in conflict as to the other negligence assigned, to-wit, that the city's servants allowed or caused the steam and smoke to escape from the roller and make a loud noise and thereby frighten her horse.

The evidence on both sides shows that when the roller is moving the steam makes a slight noise as it escapes through the exhaust, and that the weight of the roller crushing the macadam also makes a noise, and also that when the engine is reversed so as to move the roller backwards it causes the smoke and steam to puff out and to make more noise as its direction is thus being changed than it does when it is moving regularly either forward or backward.

As stated, the plaintiff says that when she got within a hundred and fifty feet of the roller it was near the "closed street" sign at north end of the block that was being repaired and was either standing still or moving so slowly that its motion was scarcely perceptible. She further says that when she got opposite the roller the steam was allowed to escape and make a special noise and it scared her horse. In this she is corroborated in more or less degree by the testimony of her witnesses, George Repple and Ed. Garth.

On the other hand the "straw-boss" of the work, Louis Bruning, testified that when he saw the plaintiff her horse was standing still, as was also the roller; that he went to him and caught him by the bridle, but he broke loose from him; that there was no noise or escaping of steam and the horse just seemed to take fright, and he knew no reason for it. Defendant's witness, William Steinkamp, testified that the roller was standing still and he heard no noise and saw no steam escaping. Defendant's witness, Daniel Miller, was on the roller; testified that the roller was moving south

and he heard the flagman's whistle and looked out and saw him waving the flag for the roller to stop, and he told the operator of the engine and he stopped it, and that by that time the flagman was running down the embankment to where the lady was lying and he held the horse. He further says: "The engine, when it's running, makes a little noise like 'Sh-sh-sh-sh;' it was not making any special noise at the time of the accident. The only steam that was escaping was through the smoke-pipe."

As before stated, the jury found for the defendant. The plaintiff assigns as error the refusal by the court to give an instruction asked by her to the effect that Broadway was a public street, and that the plaintiff had a legal right to drive thereon at the time and place stated; and that the court erred in submitting the question of contributory negligence to the jury.

I.

The gist of the plaintiff's contention is that the "summer road" was a part of Broadway, and that it had been purposely left open by the city's servants for people to drive along, which the plaintiff was doing, and therefore it was error to admit the "street closed" sign and the ordinances upon which it was based, in evidence [*absque hoc,* that the ordinances are void because a delegation of legislative power by the municipal assembly to the mayor and street commissioner], and that this being so it was error to submit the question of contributory negligence to the jury, because the plaintiff had a right to be where she was and did nothing that in anywise contributed to the accident.

All of the witnesses agree that Broadway is sixty feet wide. The evidence as to whether or not the summer road was a part of Broadway is as follows:

Plaintiff was asked:

"Q. At the time your horse became frightened,

how far was your buggy from the east side of the road?
A. I guess I was about six or ten feet.''

Plaintiff called as her witness William H. Rudolph, who was an overseer of roads in the employ of the city at that time, and after describing the street car tracks on the west side of Broadway and saying that they were repairing the street east of the tracks, and after testifying to the ''street closed'' sign at each end of the block, the plaintiff asked him these questions: ''Q. Teams were passing up and down there all day long, weren't they? A. Yes, sir. Q. You did not attempt to stop the teams from passing up and down? A. No, sir; there was a summer road there; there was plenty of room for them; there was at least forty feet of space there between the railroad track and the— Q. (Interrupting). You left a place expressly for teams to pass up and down? A. No, sir; the summer road. I had nothing to do with the summer road only to take when I was raking the mud off with the grading machine, I would run that down, and by that means I was widening the street, and raising it up at the same time. I didn't have to haul that dirt away. Q. What I want to get at is this: You did not object or attempt to prevent teams from passing up and down between those two flags, on the east side of the road, did you? A. No, sir; there was plenty of room. Q. You had no intention of stopping teams from going up and down there? A. No, sir.''

On cross-examination, defendant's witness, William Steinkamp testified as follows: ''Q. There are a great many people passing up and down the street there? A. People; no, I don't know as so many people pass there. Q. Wagons pass up and down? A. Wagons; yes, sir. Q. That is what I mean. And there is a summer road on the east side of this—to the east of the road—wasn't there, what Mr. Rudolph calls a summer road? A. Yes, there was a little summer road there. Q. And the people used that principally

to pass up and down? A. Yes, sir; in the summer time, when it was dry. Q. That is on the east side of the street? A. Yes, sir. Q. And down at the east edge of that summer road there is an embankment there; the road is raised higher than the street, isn't it —about this much higher? A. The ditch is a little lower than the street. Q. Well, the fact is that the road is above the farms, and the balance of the country out there, isn't it? A. Yes, sir. Q. About four feet; and, in making that road, they made the road up to about how far from the wire fence? How far is the wire fence from that embankment? A. Well, I don't know about that. Q. Three or four feet, or five feet? A. Oh, it was further than that; ten feet from the main road, between the wire fence and the road." On redirect examination the witness testified as follows:

"Q. I never saw that place and I don't quite understand the way it looked. You have spoken about a summer road; I am going to ask you to describe the way the whole road was, and the ditch and the wire fence, and I am going to undertake to describe it the way the picture is in my mind. Now, let us see if this is right:

"Mr. Johnson: I would rather have the witness describe it.

"Q. Very well. What is on the west side of the roadway next to the cemetery? A. Well, there is a railroad track.

"Q. The west side? A. Yes—a double track.

"Q. Between that and the bank how is the road made? A. Between the railroad track and the bank, the west side?

"Q. No; the bank on the east? A. On the east —well, there comes North Broadway.

"Q. Made of what? A. Macadam.

"Q. How wide would you say it was from the east rail of the east track over to the end of the em-

bankment on the east side of the road? A. I guess about sixty feet, something like that—the macadam, you mean?

"Q. The macadam road. A. Well, about sixty feet, something like that.

"Q. Now, after the embankment, what comes? Is it level, or does it go down the hill then, or what is it? A. Well, sir, it is the dirt was scraped off the street and it is left to one side, with the machine and kind of a little leveled off, and they call that a summer road, you know; *there is no macadam there, it is outside of the line of the road,* and in the summer time, of course, it is a little drive without the macadam, and that is called a summer road.

"Q. And where is the embankment? A. Well, outside of that yet.

"Q. And then where is the fence? A. Outside of the embankment.

"Q. Then, according to your description, we have the two tracks, then about sixty feet of macadam? A. Yes, sir.

"Q. Then we have the summer road. How wide is that, probably? A. I couldn't state that exactly.

"Q. Wide enough for a wagon? A. Yes, about."

This is all of the testimony in the record bearing upon the character of the summer road. It is not by any means clear from this testimony that the summer road constituted a part of Broadway. The utmost that can be said of it is that it leaves it a question of fact for the jury. The plaintiff's contention depends upon the summer road being a part of Broadway, and the burden was upon her to prove that to be the fact. If it was not, then it was not within the power of the city to close it up and prevent people from driving along it while the street was being repaired, and therefore it was a question for the jury whether or not the plaintiff was guilty of contributory negligence, or knowing the

conditions, assumed the risk of driving along the summer road while the steam roller was in use repairing the street. The jury found for the defendant, and in this state of the record it can not be said there was no substantial evidence to support the verdict, and this being true this court will not disturb the verdict.

But aside from this, the instruction given by the court of its own motion, as well as those asked by plaintiff and refused by the court, as well also as those given for the defendant, put the case to the jury upon the theory that the city was bound to repair its streets and had a right to use the steam roller, and that the plaintiff was on the street and had a right to be there and was exercising ordinary care and caution, and that the plaintiff was entitled to recover if the servants of the city "in charge of said roller, either knew, or by the exercise of ordinary care could have known, of plaintiff's proximity, and that as the plaintiff was near to said roller the said servants and employees of the city having charge of the said roller did, suddenly and without any warning to the plaintiff, cause steam to escape from said roller and to make a loud noise, and that plaintiff's horse became frightened thereby and jumped or ran and overturned her wagon," and she was injured.

In other words, the case went to the jury upon the only negligence charged in the petition as to which there was any question, to-wit, the act of the servants of the city in allowing or causing steam to escape and make a loud noise and scare the plaintiff's horse as she was passing along the street, and exercising ordinary care, and the jury found for the defendant, and there was substantial evidence to support the verdict. That verdict can only mean that no such steam was allowed to escape and no such noise was made by the roller as charged.

Even if it be true that the plaintiff had a right to pass along the street while it was being repaired, and

even if it be conceded that the city or its administrative officers had no right to withdraw the street from use temporarily while being repaired, and even if it be true that the summer road constituted a part of the street and that the servants of the city left it open for travel and thereby invited people to drive along there while the street was being repaired, the question was still one for the jury whether it was contributory negligence for the plaintiff to attempt to drive a horse by the steam roller, and also whether the defendant was guilty of the negligence charged in the petition.

The plaintiff objected to the introduction of the "street closed" sign and to the reading of the city ordinance in evidence, and now contends that the ordinances are void, because under the charter the power to open and close streets and to regulate their use is vested in the Municipal Assembly and can not be delegated by that body to the mayor and street commissioner. It will be observed, however, that the power of the city to thus close a street, was dropped out of the case when it went to the jury, and it was assumed in all of the instructions that the street was not closed and that plaintiff was rightfully passing along it. But aside from this, the ordinance is not void either for the reason stated or otherwise. It is true, the power to close or vacate streets and to regulate their use is vested in the assembly. But this ordinance does not offend against that charter provision. It is simply a police regulation, passed in pursuance to the general-welfare clause of the charter (par. 14, sec. 26, of art. 3, City Charter) and is in no sense whatever a delegation of *legislative power*.

The cases cited on this proposition by the plaintiff apply to a delegation of legislative powers, and not to prescribing who shall exercise police powers.

There was no error in refusing the plaintiff's seventh instruction to the effect that Broadway is a public street and that the plaintiff had a legal right to drive

thereon at the time and place where said injury occurred, for the reason that the same.idea is fully expressed in the first instruction given by the court of its own motion.

The instructions put the case to the jury as fairly to the plaintiff as it was possible to do so. The case hinged solely upon questions of fact. The testimony was conflicting, and would have .supported a verdict either way. Under these circumstances this court never interferes. The judgment of the circuit court is affirmed. All concur, except *Robinson, J.,* absent.