# WILLIAM J. PHELAN v. GRANITE BITUMINOUS PAVING COMPANY, Appellant.

### In Banc, April 26, 1910.

1. **EXCESSIVE VERDICT: Amount Alleged.** The fact that the verdict is for the full amount asked for in the petition does not of itself indicate passion and prejudice.

2. **———: Loss of Eye: $7500.** A man who has lost one eye is disfigured, humiliated and once for all handicapped, and where there were up to the time of the trial flashes of pain in the blind eye, as if from fire in it, and the use of the other was sympathetically impaired, a verdict for $7500 does not indicate such passion or prejudice as to call for the interference of the court—though before the trial plaintiff had resumed his former occupation and was receiving the same wages.

3. **DEMURRER: Whole Case Considered.** When defendant refuses to stand on its demurrer offered at the end of plaintiff's case, and puts in evidence of its own, it takes the chances of strengthening plaintiff's and only its own demurrer offered at the end of the whole case will be considered on appeal.

4. **———: Evidence Considered.** In disposing of a demurrer, defendant's evidence contradicting plaintiff's fills no office; plaintiff is entitled to have his evidence taken as true and defendant's contradictory evidence taken as untrue; and plaintiff is allowed every reasonable and favorable inference of fact naturally deducible from his own or the defendant's uncontradicted testimony. Measured by this unbending rule, if there be found any substantial evidence sustaining the essential averments of the petition, the demurrers will be overruled.

5. **STREET: Reconstruction: Use.** A city, either of itself or through a contractor, has the right to reconstruct its streets, and for purposes of repair or reconstruction may totally or partially interrupt their use by the public, and hence a contractor, with his men, material, steam roller and other appliances, with usual non-negligent noises, engaged under contract in the work of reconstruction, is in the street for a lawful purpose.

6. **———: ———: Closing Part: Use.** It is proper for the rightful authorities to close one-half the street to the public use while the work of reconstruction is going on, and to throw open the other half to use. But it would be unreasonable to rule that the public are invited to use the unclosed half, as in all respects en-

Phelan v. Paving Co.

tirely safe and convenient—that is, as free from dangers as an ordinary public street—while the work, with men, material and a steam roller, is in progress on the closed half, and in the unclosed half are piles of screenings, carts and other appliances used in the reconstruction. And it would be equally unreasonable to rule that the work of reconstruction, with its ordinary and usual attendant noises, should stop whenever a traveler undertakes, by wagon and horses, to drive upon the unclosed part. His invitation to use the unclosed part of the street has its limitations and warnings of danger based on physical facts apparent to him.

7. ———: ———: ———: ———: **Runaway: Blind Horse.** If the driver of a wagon, himself able to see, enters the unclosed half of a street being reconstructed, and his horse becomes frightened at the sight of a steam roller used in the reconstruction of the other half, or at a necessary, usual and ordinary noise attendant on the proper use of the steam roller, he assumes the risk of such fright, and of the consequent injury due to the horse's running away. He must also bear the burden of knowing the horse was blind in one eye and therefore likely to be more easily disturbed than one with good eyes.

8. ———: ———: ———: ———: ———: **Contractor's Negligence: Continuing Work.** But the traveller does not assume the risk of the contractor's negligence, by driving into the unclosed part of the street, the other half of which the contractor is rightfully reconstructing by using a steam roller and other material. The contractor owes the traveler due care, though the traveler is handicapped by certain risks he assumes—the risks of knowing his horse's vision is impaired, that the street is being repaired, that the steam roller is being used, that the physical facts give warning that the use of the street is attended with dangers not incident to the ordinary use of the street not being reconstructed, and that a proper use of the steam roller is attended with certain noises, puffings, escaping steam, etc. But the contractor, though rightfully in the street, and though he is not required to stop his work in the first instance when the traveler enters upon the unclosed half, cannot continue to perform his work so negligently as to injure the traveler; if the usual noises of the street roller cause the traveler's horse to become restive, shy off, and to act as if becoming unmanageable, and such condition of things becomes apparent to the engineer upon the moving steam roller and he could by stopping promptly put a stop to the noises, he cannot voluntarily continue the noises thereafter, and thereby put the horse into a panic, beyond control, cause it to run away and injure the traveler.

9. ———: ———: **Steam Roller: Whistle.** The unnecessary use of a steam whistle on a steam roller being used in the reconstruction of a street, on a highway, whereby horses are frightened and human beings injured, is actionable negligence. And in this case there was no evidence and no claim that the use of the whistle, as such, was necessary in running the roller at the time of the injury to the driver of the wagon; and there being substantial evidence that the roller had a steam whistle and that it was in operation when the driver's horse took fright and ran away, injuring him, though the evidence preponderates that no whistle was blown and that the roller had none, the defendant's demurrer should have been overruled.

10. ———: ———: ———: **Unusual Noises.** Unusual and unnecessary terrifying noises from a steam roller being used in the reconstruction of a street, when travelers in vehicles drawn by horses are journeying hard by on the other unenclosed half of the street, are actionable negligence; and the evidence showing that the puffing noises were unusual and extraordinary in volume, the defendant's demurrer to the driver's case was properly overruled.

11. ———: ———: ———: ———: **How Shown to Be Unusual.** Where the witnesses have testified that the noises made by the steam roller were unusual and extraordinary and very loud, and defendant did not object or undertake to ascertain, by cross-examination or a test of their competency, whether they meant they were extraordinarily loud and unusual as compared to ordinary noises of a street roller or as compared with ordinary street noises, the court will not rule there was no evidence that the noises were not unusual and extraordinary. It was for defendant to develop the fact.

12. ———: ———: ———: **Continuing Usual Noises: Humanitarian Doctrine.** If one is in peril, and another, seeing his peril, omits to save him when it is in his power, such other is guilty of negligence. So if the engineer in charge of the moving street roller saw that the usual noises frightened the horse which plaintiff was driving, and, giving no heed to his frightened condition, continued the original cause of the fright, until the horse broke away from the driver's control, and the runaway was caused by such continuation, then the contractor is liable, though the continued noises were usual and ordinary.

13. ———: ———: ———: ———: **Seeing Traveler Approach.** The steam roller was moving east up grade, on the south side of the street, and nearly opposite it, on the north side, which had not been closed to travelers, were a heap of screenings and a push cart. The engineer testified that he was looking east, saw

plaintiff fifty or sixty feet away approaching in his wagon to which was hitched a horse; that the horse then showed no signs of fright, that the usual noises of the steam roller continued, and that the horse did not become frightened until he ran into the screenings heap or cart, and then he ran away. *Held*, that the engineer, though introduced as a witness for plaintiff, must be held to have seen what others saw, and others testified they saw the horse taking fright sixty or more feet to the east of the roller as it moved east, and that the noises continued.

14. ———: ———: ———: ———: ———: **Contradicting One's Own Witness.** The fact that plaintiff reads to the jury testimony of the engineer, taken at a former trial, as a part of his own case, does not bind him to the engineer's judgment and conclusions or all his statements of fact. He is thereafter precluded from showing him unworthy of belief, that is, from impeaching him; but the object of a lawsuit is to elicit justice by getting at the truth, and a litigant may show the facts by other witnesses, although such facts contradict his own witness and incidentally or indirectly hurt his credibility.

15. ———: ———: **Driving on Street in Violation of Ordinance: Humanitarian Doctrine.** The south half of the street was being reconstructed, and across the end of that half was a barricade, and on it was a notice "street closed" and "this street is temporarily withdrawn from public use," and an ordinance made it a misdemeanor to use or attempt to use a street "so withdrawn from public use." *Held*, first, that the driver of a wagon on the north half of the street, which was not barricaded or posted, but on which had been placed screenings, a cart and other appliances used in reconstructing the south half, was not violating the law in driving thereon; *second*, even though he were violating the law, that does not preclude his right to recover from the contractor for injuries due to his horse taking fright at the noises of the steam roller, for such violation was not the proximate and direct cause of his injury, but only an attendant circumstance or condition of the accident, and the case is like that of a trespasser on a railroad track in violation of an express statute, who cannot be injured with impunity where his peril is seen, etc.

16. ———: ———: **Contributory Negligence: Driver Choosing Dangerous Way.** The principle that when there are two open ways of doing a thing, one dangerous and the other not, and plaintiff chooses the dangerous way and is injured, no recovery lies, applies only when there are two ways of doing the very thing that caused the injury. The driver of a wagon on a street being reconstructed is not barred a recovery for injuries due to his horse taking fright at a steam roller and running away, by the

fact that he voluntarily chose to drive in that street when another free from danger was open and equally convenient to him. Actionable injury, if any, being caused by the negligence of the engineer in charge of the roller after the driver entered the street being reconstructed, contributory negligence defeating recovery must also relate to the acts of the driver after he entered on the street. Defendant's negligence and plaintiff's contributory negligence must relate to each other in order to meet and offset each other.

17. INSTRUCTION: To Cover Whole Case: Precision. The fact that the verdict is for a good round sum and that the case is a close one on its main features requires that the instruction intended to outline the whole case should have been drawn with precision, simplicity and circumspection.

18. ———: Steam Roller on Street: Puffing and Whistling. Since puffing of a steam roller rightfully at work in reconstructing a street might be a necessary and ordinary noise, and whistling an unnecessary and negligent one, an instruction so drawn as to put whistling and puffing on a par is faulty.

19. ———: ———: Ordinary Noises: Continuation: Commingling of Negligent Acts. In a suit against the contractor engaged, with a steam roller, in reconstructing a street, by a driver of a wagon whose horse took fright and ran away, an instruction should not be so drawn as to mislead the jury to understand that if the horse became unmanageable at the outset from the puffing (though ordinary and necessary) the contractor was liable for the driver's consequent injuries. The driver, in entering the unclosed half of the street where the reconstruction was going on on the other half, took the chances of his horse taking fright and running away because of an ordinary and necessary noise and puffing in running the roller, and the contractor is not liable unless the engineer, on becoming aware of the fact that the horse was taking fright, continued the noises, and such continuation produced the panic, made the horse unmanageable and caused it to run away. And that idea should not be put to the jury vaguely, or be so interwoven with other phases of the case as to be calculated to give the mind of the jury a twist or a bias against defendant, but it should be put to them singly and plainly.

*Held*, by GANTT, J., with whom VALLIANT, C. J., and WOODSON, J., concur, that the instruction clearly informed the jury that a failure on the engineer's part to stop the running of the steam roller and the whistling and puffing noises after he discovered the driver's horse was becoming unmanageable, constituted negligence, and it especially left it to the jury to find whether the engineer negligently

failed to do so; it conceded to defendant the right to operate the roller in improving the street, but it denied to defendant the right, after the engineer discovered the peril in which the driver had been placed by the fright of his horse at the whistling and puffing noises, to continue those noises when they could have been almost instantly stopped with no appreciable loss of time and no inconvenience, and was correct, and the judgment should not be reversed.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher*, Judge.

REVERSED AND REMANDED.

*Percy Werner* and *Wm. C. Marshall* for appellant.

(1) The demurrers to the evidence should have been sustained: both that offered at the close of plaintiff's case, and that offered at the close of the whole case. Defendant owed plaintiff no duty, and therefore did not fail in the performance of any duty. (a) Duty lies at the foundation of negligence; and if defendant owed plaintiff no duty, it is not liable to plaintiff. Gurley v. Railroad, 104 Mo. 223; Roddy v. Railroad, 104 Mo. 244; Atherton v. Coal Co., 106 Mo. 591; Barry v. Calvary Cemetery, 106 Mo. App. 362; Glaser v. Rothschild, 106 Mo. App. 424; Pueschell v. Wire Works, 79 Mo. App. 459. (b) Defendant did not owe to plaintiff the duty of operating the roller in any different manner from that in which it was operated. A. The testimony introduced by plaintiff (and defendant's evidence is to the same effect), establishes the fact that neither the puffing, nor the so-called whistling, was unusual. The witnesses for plaintiff testify that on many previous occasions they had heard like puffing and like whistling. The fact that there was no whistle on the roller is immaterial, in view of the testimony of plaintiff's witnesses. The fact remains that what they mistakenly took to be whistling was not unusual. B. There is no allegation in plaintiff's pleadings, and there was no evidence that any of these

noises were unnecessary at the time of the accident.
C. The roller was lawfully on Laclede avenue, and
was a proper and necessary implement for the perform-
ance of defendant's contract with the city. Lane v.
Lewiston, 91 Me. 292; Cairncross v. Pewaukee, 78 Wis.
71; Dist. of Columbia v. Moulton, 182 U. S. 581. The
city would not have been liable under the circumstances
of this case, and defendant is equally free from liabil-
ity. (c) It was not a part of the duty of the defend-
ant's engineer to be constantly on the lookout for
frightened horses; especially in view of the fact that
the street was closed, and no person had a legal right
to drive on it. Frye v. Railroad, 200 Mo. 377. A. No
such duty is charged in the plaintiff's pleadings. B.
The engineer was there to operate that roller for the
purpose of reconstructing a street for the city, not for
defendant; for the benefit of the public, not for de-
fendant's benefit. No such duty devolved upon the
engineer as rests upon the motorman of a street car,
or the engineer of a steam locomotive. C. The engi-
neer had a right to assume that no person would drive
a horse up to that roller, unless he was sure the horse
would not become frightened; and his right to so as-
sume was absolute in view of the prohibition of the
ordinance, and the warning notice at the head of the
street. American Brewing Assn. v. Talbot, 141 Mo.
685; Winckler v. Railroad, 169 Mo. 598; McLeland v.
Railroad, 105 Mo. App. 479; Wendall v. Railroad, 100
Mo. App. 561; Paden v. Van Blarcom, 100 Mo. App.
193, 181 Mo. 117. The presumption is that the engineer
did his duty. Jewitt v. Railroad, 50 Mo. App. 551; Mc-
Allister v. Ross, 155 Mo. 94; State ex rel. v. Crumb,
157 Mo. 556; Monumental Bronze Co. v. Dotz, 92 Mo.
App. 10; Guest v. Railroad, 77 Mo. App. 261. (d) The
evidence introduced by plaintiff shows that the engi-
neer did, in fact, stop the roller immediately upon be-
coming aware of plaintiff's peril. A. Plaintiff him-
self testifies that the engineer was not in a position to

see plaintiff; that his back was turned to plaintiff, and he was looking away from plaintiff, at the time plaintiff testifies that the horse became frightened, and until the accident happened. B. The engineer's testimony is that he did observe the horse, but that in his opinion the horse did not become frightened until he reached the spot where plaintiff's wagon was overturned, and that the engineer then promptly stopped the roller. Frye v. St. Louis Railroad, 200 Mo. 377. Under that decision plaintiff must not only prove that the engineer actually saw him, but that he actually saw he was in danger. C. No other witness testifies on this point. 2. Plaintiff's violation of the city ordinance was the cause of the accident, and he has no right of action for an injury which could not have occurred but for his violation of law. (a) The use of the streets by vehicles may be regulated by the city. Kansas City v. Richardson, 90 Mo. App. 457; State ex rel. v. Murphy, 130 Mo. 22. (b) A violator of the law cannot come into a court of justice and ask relief from the consequences of his own unlawful act, unless he alleges and proves that his injury was caused by a wilful and wanton act of the defendant. Barney v. Railroad, 126 Mo. 392; Newcomb v. Boston Protective Dept., 146 Mass. 596; Clark v. Railroad, 127 Mo. 213; Abbott v. Wolcott, 38 Vt. 672; Crescent Township v. Anderson, 114 Pa. St. 643. (c) The violation of a statute or ordinance is negligence *per se*, and the rule applies to the plaintiff equally with the defendant. Weller v. Railroad, 120 Mo. 655; Barney v. Railroad, 126 Mo. 392; Johnson v. Simonton, 43 Cal. 242; Jackson v. Shawl, 29 Cal. 267. Especially where plaintiff had, as in the case at bar, warning that the street was closed. Ray v. Poplar Bluff, 70 Mo. App. 261. (d) The accident was the direct result of plaintiff's violation of the law. (e) Even if the ordinance had not been set forth in the notice of "Street Closed," plain-

tiff is conclusively presumed to know the ordinance. Jackson v. Railroad, 118 Mo. 218; Heland v. Lowell, 3 Allen (Mass.) 407. (f) It is immaterial whether or not the ordinance contains express words of prohibition. Downing v. Ringer, 7 Mo. 585; Amusement Co. v. Forest Park Co., 192 Mo. 424; Hatch v. Hanson, 46 Mo. App. 330; State v. Canton, 43 Mo. 48; Jackson v. Shawl, 29 Cal. 267. 3. Plaintiff, by taking the route which led through Laclede avenue, when other, and perfectly safe, routes were open to him, which routes were as convenient as that through Laclede avenue, assumed the risk of all consequences which might result from driving past the steam roller. O'Donnell v. Patton, 117 Mo. 20; Junior v. Electric Co., 127 Mo. 79; Clark v. Railroad, 127 Mo. 213; Cohn v. Kansas City, 108 Mo. 392; Gerdes v. Foundry Co., 124 Mo. 355; Heberling v. Warrensburg, 204 Mo. 614; Ray v. Poplar Bluff, 70 Mo. App. 261; Fitzgerald v. Paper Co., 155 Mass. 158; Schaeffler v. City, 33 Oh. St. 246; Corlett v. Leavenworth, 27 Kas. 673; Erie v. Magill, 101 Pa. St. 616; Centralia v. Kronce, 64 Ill. 23; Knickerbocker Ice Co. v. Leyds, 128 Ill. App. 66; Wilson v. Charlestown, 8 Allen 137; Lane v. Lewiston, 91 Me. 295; Lovinguth v. Bloomington, 71 Ill. 241; Wright v. St. Cloud, 54 Minn. 97; Dist. of Columbia v. Moulton, 182 U. S. 576. (a) There is no repugnancy between this proposition and the decisions to the effect that one is not bound to entirely refrain from travel over a street in which there is a defect, if such defect can be avoided by the exercise of reasonable care. Cohn v. Kansas City, 108 Mo. 393; Beach on Cont. Negl., sec. 247; Gerdes v. Foundry Co., 124 Mo. 356; Ray v. Poplar Bluff, 70 Mo. App. 258; Gosport v. Evans, 112 Ind. 133; Harris v. Clinton, 64 Mich. 447; Wright v. St. Cloud, 54 Minn. 94; Fulliam v. Muscatine, 70 Ia. 436. (b) The danger, if any, from the appearance and noises of the roller filled the street; there was no escape from them except by not going on the street. (c) Plaintiff was not compelled

to take the route over Laclede avenue. Market v. St. Louis, 56 Mo. 189; Ashby v. Gravel Road Co., 99 Mo. App. 186. (2) There is no room in this case for the application of the last chance doctrine. 1. This issue is not properly raised by the pleadings. (a) Plaintiff does not allege that he was negligent, and that, notwithstanding his negligence, defendant might have prevented the accident. The plaintiff's primary negligence is essential to the calling into exercise of the last chance rule. 2. This ground of recovery is affirmative, and the burden is on the plaintiff to prove the facts establishing it. It is not for defendant to show the non-existence of such facts. 3. The evidence failed to show the necessary facts. (a) Plaintiff's testimony shows that the defendant's engineer could not have seen plaintiff's peril, since, according to plaintiff's testimony, the engineer's back was turned toward plaintiff, and he was looking away from plaintiff. (b) The testimony of plaintiff's other witness, the engineer, shows that he did stop the roller the instant he perceived plaintiff's danger. (c) The instructions failed to present this issue properly. (d) Plaintiff's negligence was active, not omissive. Dale v. Construction Co., 108 Mo. App. 97. 4. It requires more than the showing of a mere possibility that the accident might have been avoided in order to bring a case within this doctrine. Markowitz v. Railroad, 186 Mo. 359. 5. Where there is no element of wilfulness or wantonness, this doctrine has no application. Kellny v. Railroad, 101 Mo. 75; Rapp v. Railroad, 190 Mo. 159; Theobald v. Railroad, 191 Mo. 438; Deane v. Railroad, 192 Mo. 584; Clancy v. Railroad, 192 Mo. 651; Zumault v. Railroad, 175 Mo. 313; Howerson v. Railroad, 157 Mo. 216. (3) Instruction 1 is fatally erroneous. (a) There is no evidence to support it. The only act of negligence submitted to the jury is the failure of the engineer to act after he saw that plaintiff was in peril. The record contains no evidence tending to establish this fact. On

the contrary, the testimony of the engineer, plaintiff's own witness, is positive that he did act the instant he saw the danger. (b) All these instructions ignore the defense that plaintiff was in the violation of law when the accident occurred. (c) Instruction 3, given for the plaintiff, selects certain grounds of contributory negligence pleaded, and ignores the other grounds, especially this one of violation of law. Hence the jury were warranted in concluding that they had no right to consider this last mentioned defense.

*Claud D. Hall* for respondent.

(1) The demurrer to the evidence was properly overruled. (a) It was prima-facie negligence for the engineer to discharge sudden puffs of steam and whistle as plaintiff approached, driving his horse. Feeney v. Railroad, 123 Mo. App. 428; Haller v. St. Louis, 176 Mo. 606; Brown v. Railroad, 39 Mo. App. 192; Stamm v. Railroad, 1 Abb. Cas. 438; Flynn v. Railroad, 169 Mass. 305; Rodgers v. Railroad, 150 Ind. 397; Railroad v. Barnett, 59 Pa. St. 259; Hanlon v. Turnpike Co., 182 Pa. St. 115; Lightcap v. Traction Co., 60 Fed. 212; Bennett v. Lovell, 12 R. I. 167; Railroad v. Fulton, 39 S. 282; Class v. Railroad, 94 Ala. 581; 23 Am. & Eng. Ency. Law. p. 744; Hickey v. Railroad, 82 Pac. 29; Powell v. Railroad, 82 Pac. 96. (b) It was the engineer's duty to stop the steam roller and the noise, when he saw or might have seen that plaintiff was being placed in a position of peril. Oates v. Railroad, 168 Mo. 535; Phelan v. Paving Co., 115 Mo. App. 423; Heller v. St. Louis, 176 Mo. 606; Shinkle v. McCullough, 116 Ky. 960; Indiana Springs Co. v. Brown, 74 N. E. (Ind.) 617; Murphy v. Waite, 92 N. Y. Supp. 253; Ellis v. Railroad, 160 Mass. 350; Galesburg Electric Co. v. Manville, 61 Ill. App. 492; Benjamin v. Railroad, 160 Mass. 5; Hanlon v. Turnpike Co., 182 Pa. St. 115; Brown v. Railroad, 89 Mo. App. 196; Hinzman v. Railroad, 182 Mo. 611, and 199 Mo. 56; Sites v. Knott, 197

Mo. 684; Dieter v. Zbaren, 81 Mo. App. 612; Abbott
v. Railroad, 121 Mo. App. 582; Sapp v. Hunter, 115
S. W. 463. (c) Under the circumstances of this case
the failure of defendant to use ordinary care to stop
the roller and noises was itself a wanton act, and the
humane doctrine was applicable. Cole v. Railroad, 121
Mo. App. 605; Drogmund v. Railroad, 122 Mo. App.
154; Beckenwald v. Railroad, 121 Mo. App. 595; Phe-
lan v. Paving Co., 115 Mo. App. 423. (d) Plaintiff
did not assume the risk of being injured nor was he
guilty of contributory negligence. His horse was gen-
tle and he did not anticipate any danger. Oates v.
Railroad, 168 Mo. 549; Feeney v. Railroad, 123 Mo.
App. 420; Heller v. St. Louis, 176 Mo. 606. He was not
compelled to take another street. Railroad v. May-
nard, 5 Ind. App. 372; Doran v. Railroad, 117 Ia. 442;
Oates v. Railroad, 168 Mo. 535; Heller v. St. Louis, 176
Mo. 606; Ahlfeldt v. Mexico, 108 S. W. 122. A. But
if plaintiff was negligent in taking Laclede avenue, it
was the engineer's duty to stop the roller and the noise
when he saw or could have seen plaintiff's position of
peril. Moore v. Railroad, 126 Mo. 277; Feeney v. Rail-
road, 123 Mo. App. 420; Oates v. Railroad, 168 Mo. 535;
Hinzeman v. Railroad, 182 Mo. 611; Rapp v. Railroad,
190 Mo. 161; Waddell v. Railroad, 113 Mo. App. 680;
Wise v. Railroad, 198 Mo. 546. B. The plaintiff did
not violate section 912 of the ordinances. C. But even
if plaintiff violated the ordinance, defendant would still
be liable, as defendant's negligence was the proximate
cause of injury. Kelley v. Railroad, 75 Mo. 138; Haller
v. St. Louis, 176 Mo. 606; Oates v. Railroad, 168 Mo.
535; Karle v. Railroad, 55 Mo. 476; Holman v. Rail-
road, 62 Mo. 562; Reed v. Railroad, 50 Mo. App. 504;
Evans v. Railroad, 17 Mo. App. 624; Beckerle v. Wei-
man, 12 Mo. App. 354; Newcomb v. Protective Assn.,
146 Mass. 602; Felver v. Railroad, 216 Mo. 195. D.
The defendant by introducing testimony waived its
demurrer to plaintiff's evidence, and took the risk

of supplying by its own evidence the defects, if any, in plaintiff's case, and the entire evidence must be considered. Storck v. Mesker, 55 Mo. App. 26; Felver v. Railroad, 216 Mo. 195; Riggs v. Railroad, 216 Mo. 304. (2) Plaintiff's instruction 1 was proper. Phelan v. Paving Co., 115 Mo. App. 423; Oates v. Railroad, 168 Mo. 535; Moore v. Railroad, 126 Mo. 546.

LAMM, J.—Negligence—damages, $7500. Defendant appeals. Assigned to Division Two, the cause comes into Banc on its order on a motion for rehearing.

Error is assigned mainly on overruling a demurrer to the evidence (offered twice and twice refused) and on instructions—the breadth of the assignments seeking a close and full review of testimony and pleadings.

The negligence charged is in operating a steam street-roller on Laclede avenue in St. Louis. The petition states that as plaintiff was lawfully driving a one-horse wagon to the west on the north side of said avenue, a public street, the defendant, through its servants in charge of said roller at said point, "so carelessly, negligently and recklessly managed and conducted" the roller "that the same scared" his horse "and the said horse was caused to shy and run away." (The accident is here described, viz., the runaway, the wagon colliding with the curb and a box of street paving material, throwing plaintiff out and injuring him).

Recurring again to the charge of negligence the petition particularizes thus: "Defendant's said agents and servants in charge of said steam street-roller knew and saw, or by the exercise of reasonable care, could have known and seen, that the plaintiff's horse was being scared by the running and unusual puffing and frightening noises of the steam street-roller, and that plaintiff's horse was about to run away, and that plaintiff was being placed in a position of peril, in time

for defendant's said agents and servants to stop or check the running of said steam street-roller and check its unusual puffing and frightening noises and thereby prevent the plaintiff's horse from frightening and running away, and the injuries to the plaintiff. But that defendant's said agents and servants in charge of said steam street-roller did, nevertheless, carelessly, negligently and recklessly run and operate said steam street-roller at an unusual speed and with unusual and frightening noises, whereby plaintiff's horse was scared and ran away, and plaintiff was injured as aforesaid."

Following these allegations, his injury is alleged (the loss of an eye), with his outlay, pain, loss of earnings, etc., praying damages for $7500.

By answer defendant denies generally and, for an affirmative defense, alleges that if the defendant was injured, as his petition states, his injuries were caused by his "own want of ordinary care in driving a blind horse with defective harnessing and in a careless manner upon said street in question, with full knowledge of and in full view of the said steam roller, which was then and there being operated in said street in pursuance of contract entered into by and between this defendant and the city of St. Louis."

The answer next alleges that Laclede avenue, at the region in hand, was closed by authority of the street commissioner and was marked as closed in accordance with a city ordinance, "the northern half thereof being left open for the passage of street cars and the entrance of persons having business upon said street." Next, that by entering upon said Laclede avenue at that point and driving west the plaintiff "was guilty of want of ordinary care for his own safety and of a violation of section 912 of the general ordinance provisions of the city of St. Louis."

There is a further specification of contributory negligence, viz., that plaintiff had no business at that

time on that part of Laclede avenue, that he had a perfectly safe route to his destination by using other streets in the vicinity, that to drive on Laclede avenue at that point ''while the work of reconstructing was in progress and a large steam roller in operation, with the material and appliances for reconstruction on said street, was obviously dangerous, and that plaintiff voluntarily and without any necessity therefor, chose the most dangerous of the routes open to him and in so doing was guilty of the lack of ordinary care for his own safety.''

The reply was conventional.

It will serve a useful end to sift the undisputed from the disputed facts. Accordingly, in paragraph ''A'' of this statement those undisputed will be assembled, *viz.*:

(A)   Laclede avenue runs east and west in St. Louis, with double street railway tracks in the center. From these tracks to either side of the street the curb is fifteen feet away. Laclede in that region is crossed by three north and south avenues, *viz.*, east of the accident by Grand, next west of Grand (and still east of the accident) is Spring and west (a long block away) is Vandeventer. Between Grand and Vandeventer, Laclede was in progress of reconstruction by defendant under the supervision of the city authorities and a contract between defendant and the city. The north half of the street had been completed. While in actual use for travel by wheeled vehicles, it was also in use to store material and implements used in the reconstruction of the south half, then and for some time (with plaintiff's knowledge) actively in progress. At the point of the accident, *viz.*, between Spring and Vandeventer, there was a heap of granite screenings or crushed granite, on the north side of Laclede. The size of the heap is dark, one witness referring to it as a ''load''—we infer a wagonload—another witness said it extended into the street about six feet. A very few

feet from the curb and west of, but hard by this heap, was a two-wheeled handcart equipped with handles, bed and funnel, its wheels three and one-half feet high. Its use was to take loads of screenings from this heap and wheel them by hand to the south half of the avenue where the screenings were scattered and used as a top dressing and pressed and smoothed down by the rollers passing to and fro. Commencing not far from Grand and going west, the grade of Laclede is down hill to Vandeventer. At a certain time, say eight o'clock in the morning of October 3, 1904, after street work had commenced, plaintiff drove on Grand to Laclede and turned west towards Vandeventer in plain view of the street reconstruction and the appliances and material in use. Across the south side of Laclede, *i. e.,* from the car tracks to the curb, at Grand avenue, there was a barricade of some sort. This he also saw. On this barricade was a notice as follows:

'STREET CLOSED.

"THIS STREET IS

"TEMPORARILY WITHDRAWN FROM PUBLIC USE.

'By authority of the

"Municipal Code of St. Louis.

"Section 912. The street commissioner is authorized, with the approval of the mayor, to close any street, alley, public place or highway, and withdraw the same from public use temporarily, and during such period as public work thereon shall make such action necessary. Any person using or attempting to use said street, alley or public place or highway, so withdrawn from public use, or driving or attempting to drive any animal or vehicle thereon, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined not less than ten dollars nor more than fifty dollars for each offense.

"Section 913. It shall be the duty of the police within their respective districts to watch for and arrest persons violating the provisions of the above next preceding section.

"Approved: Rolla Wells, Mayor.

"By order of   F. W. Valliant, Street Commissioner."

In addition to this notice the visible signs of street reconstruction were plain and plentiful from the junction of Grand and Laclede west to the junction of Vandeventer and Laclede, but, as said, the north half of Laclede was open and in use by those choosing to go along there. At this immediate time not far from the heap of screenings and the cart mentioned, and on the south side of Laclede, was a heavy ten or fifteen-ton street-roller with steam up and in use—a necessary contrivance in constructing the street of bituminous macadam in accordance with the contract between the defendant and the city. This roller was run by one of defendant's employees as engineer—Peter F. Murray, then at his post of duty. When running the roller made noises, more noise up hill than down. When it stopped the noises stopped and it could be stopped in "an instant." Scattered along the street was a gang of men at work, some on the south and some on the north side of Laclede. One or two of them were filling said cart from the heap of screenings.

Plaintiff was thirty-one years old and in the employ of a laundry and had good eyes. He was driving a big bay horse to a covered wagon, intending to collect or deliver clothes on that part of Laclede west of Vandeventer. He had no laundry business on Laclede between Grand and Vandeventer. Pine street is parallel to Laclede, a block north. It was asphalt, a residence street, with no impediments and no street railways, and plaintiff admits he could have as "conveniently and readily" driven west on Pine to Vandeventer and then over to Laclede had he so liked, as to drive west

on Laclede. Plaintiff had driven the horse about St. Louis for several years. The only estimate given of his characteristics is that it was "gentle." One witness described it as "docile as a dog." Plaintiff says he had driven it near the street car tracks and the street cars, around steam engines. "When I drove him," said plaintiff, "around street cars or steam engines, he acted as though there was nothing to it." He was a "slow horse generally" and "was never known to make any bad breaks." He had been driven around the grounds during the construction of the World's Fair and around the engines making streets on the fair grounds. But about a year and a half before the accident the horse had gone totally blind in one eye. The record does not tell us whether he was blind in that eye while he was being driven around the road engines at the World's Fair, nor whether the sight of the other was then failing, nor does it disclose whether he had ever been driven as close to a steam street-roller in active operation as plaintiff undertook to drive him on October 3, 1904. Plaintiff knew the condition of the horse's eyes and testified that the sight of the eye not totally blind "was failing." We infer that the sight of the failing eye was becoming progressively worse from day to day. At the time of the accident the horse could not, with his failing eye, see an object the size of a man further away than fifteen or twenty feet.

It is agreed on all hands that at the time and place in question, while being driven towards this roller, the horse took fright and ran away, upsetting the laundry wagon, throwing plaintiff violently against the curb, splitting and putting out one eye and sympathetically impairing the use of the other. Up to the time of the trial there were flashes of pain in the blind eye, as if from fire in it, and the parts had not healed so that a glass eye could be used all the time. From such permanent injuries, paying no attention to temporary

minor ones, plaintiff has suffered and will continue to suffer much pain and disfigurement. He has been put to outlays and loss of time, the details of which we deem immaterial.

Referring to the pleadings, testimony and instructions, it will do to say at this point that plaintiff offered no testimony tending to show any "unusual speed" in the roller as charged in his petition, nor was such an element of negligence put to the jury. On the other hand defendant did not show that the horse was driven "with defective harnessing" as charged in the answer. The evidence tends to show his harness sound.

The case may proceed on the theory that the foregoing facts were either proved and remained uncontradicted, or are conceded true.

We now come to facts about which there is discussion. They are either contradicted in the main or certain incidents thereof are in dispute and different conclusions are drawn by counsel. They will be grouped under paragraph "B."

(B) Mr. Phelan testified, in substance, that while driving west on Laclede he kept north of the street car tracks on the completed portion of the street, that the roller was on the south side of Laclede "going back and forth," but at the time he first observed it "it was practically dead." On his estimate, when he was, say, fifty or seventy-five feet west of Spring avenue and within forty or fifty feet of the roller, it began to move and (quoting) "it commenced blowing off steam and blew its whistle very loud, extraordinarily loud, and it frightened my horse and he started to run away." At that time he was east of northeasterly from the roller and going towards it. He first noticed the roller when he was at or a little beyond Spring avenue, and he describes it further as "practically still" until he got past the junction of Spring and Laclede, it being then one hundred and fifty or two hundred feet west of

Spring. Asked how long the whistle and blowing off steam continued to make a noise, his answer was: "Well, he did not stop until I was thrown out of my wagon, he didn't stop this." Plaintiff had his hands on the lines, but did not anticipate the horse becoming frightened at the roller. He says his horse was "rearing and plunging two or three minutes" until the wagon was upset by running into the curb. After the engine began to move it went "back and forth." When the noises began it was next to the curb and then it came back to the track eastward towards plaintiff. At one place in his testimony he said that he saw the engineer in charge of the engine but did not see which way he was facing. Again he says he, the engineer, was "facing kind of westwardly; you could hardly call it westwardly, kind of southwardly." His horse pulled to the curb, ran along the curb a little bit and hit what plaintiff called a "box of cement"—evidently the handcart hereinbefore mentioned. He represents the horse as running fifty or sixty feet before he struck the curb and about fifteen feet along the curb before he struck the box and upset the wagon. Recurring to the noises, he again describes them this way: "Why, there were very rapid and quick puffs, and very loud, louder than I had ever heard before and I guess five or six sharp and shrill whistles, rapid, right one after the other and very loud."

On cross-examination he denies having his lines hooked up in front of him and, on being again inquired of in regard to the noises, reiterated his testimony in chief, calling them "shrill whistles," "the same order as a locomotive whistle," "louder than those given by a locomotive engine." Inquired of as to what direction the roller was going, he said it was travelling northeast as he was driving west. "I saw," said plaintiff, "the engineer and he was facing southwest, facing in the same general direction as I was; facing sort of

southwest while I was facing directly west. His back was partly turned towards me." The cart was about opposite or a little west of the engine, across the street car tracks from it and about three or four feet from the curb.

From William Archer, a city salesman plying his avocation on Laclede at that time and standing twenty-five or thirty-five feet from the accident, plaintiff elicited the following testimony: The engine made a good many puffs, spurted out a lot of steam and blew the whistle three or four times. Those puffs and spurts of steam were rather loud and shrill; did not count them but should judge it whistled three or four times. "This puffing" said the witness, "and these whistles and these spurts of steam continued right along; I never noticed it ceased working for a minute or two." Plaintiff's horse reared and plunged going west and ran into "a box of tools" and turned the wagon over. He paid no particular attention to the time but estimated "the rearing and plunging lasted some two or three minutes." He further says "the puffing and noise was going on during all that time."

(Note—It will be observed that this witness does not testify that he saw the engineer or noticed which way his face was turned and at this point it will do to say that no other witness, except plaintiff himself and the engineer, Murray, who was plaintiff's witness, gives testimony on that point.)

Continuing, witness said that what called his attention to the roller was "the unusual noise"—"the blowing of the steam and the whistle." At the time the noises scared the horse it was about thirty-five feet northeast of the roller. On cross-examination witness stated the whole thing happened very quickly. It may have been a couple of minutes and could not have happened in less than a minute. Witness was not attempting to measure the time. He did not know what turned the wagon over, whether it was the heap of granite

screenings or "the tool box." By tool box witness meant the thing that was used for conveying screenings; he knew the wagon hit that.

Mrs. John Henning testified for plaintiff, in substance, that she saw the accident. The first thing she noticed was the "puffing" and "whistling" of the engine, then she saw the laundry man's wagon coming down, noticed the frightened horse and that plaintiff was trying with all his might to stop it but could not. She was allowed to give the reason for his inability to control the horse and gave it as follows: "Because the engine kept puffing and blowing its whistle, so that all the time they did not stop it, but kept going and coming east and west with the engine, and he, of course, could not control his horse." She says the noises began when the wagon was fifty or sixty feet east of the roller. She did not know how long they continued "but they kept on going all the time; they did not stop during the time the horse was plunging; they did not stop at all; they did not stop right away after the accident was over; I think after they had heard the man scream, I think then they stopped. It puffed just as an engine would puff, only very loud, and they kept on blowing the whistle." Inquired of if she observed any whistle on the engine she replied: "O, yes, sir, there was a whistle on the engine, for the little children, boys and girls in the neighborhood, would go up there and blow the whistle; there was a whistle on the engine, I know." The engine had been working there for a considerable time. Witness lived in the second house from the corner of Spring and Laclede and said "I heard the whistle; I know I heard the whistle; there was a whistle on that engine; those whistles were very much like a railway whistle, very loud. Every time they used that engine that whistle was blowing."

A school girl, Louretta McCoy, witnessed the accident on her road to school. Her description of it is

in substance that the engine was going back and forth "making a very loud noise, puffing and blowing and whistling noise, very loud, very deafening." She does not know how long the noises continued but estimates it as "a good while." The horse was "shying and kicking up in the air." Mr. Phelan was pulling on the lines and trying to hold it back but the horse kept running on for about thirty feet and got right opposite the engine and then the accident happened.

Miss Friedman saw the accident. She heard the whistles and said the horse was scared "after the whistle blew." Referring to the noises she called them "puffing." She did not know how many puffs, but they were very loud and did not continue long.

A Mr. Willard was called for plaintiff. He did not see the accident but had worked for defendant and had run an asphalt roller, a steam street-roller, and was familiar with the construction of such rollers. He testified such a roller can be stopped within a few inches. It is started and stopped by manipulating a throttle. Shut off the throttle and the engine stops practically instantly. That stops the noise. The exhaust is what makes the noise.

On cross-examination the witness said that when he worked for defendant "the year before the fair" they had some engines with whistles and some without whistles. The employees were cautioned not to blow the whistles. Witness admitted he had testified at a former trial that few rollers have whistles and that he had then said that when he was working for defendant only one or two of them had whistles. He also stated that he did not know "the Universal Steam Rollers which defendant got from Julian Scholl and Co." (Note— The steam roller in question had been purchased by defendant from Julian Scholl and Co. in the early summer of 1904 and was known as the Universal Steam Roller). Testifying as one competent to know from experience, witness said that a puffing noise was an

incident to working a steam roller, that there was puffing all the time the roller is working. The more up-grade it is, the harder or louder the puffing. Such rollers have an automatic steam escape. If any excess of steam is made a pop valve allows the steam to blow off. When the engine is working the steam is generally used and the puffing does not occur. It was not necessary to blow a whistle in operating a steam roller. He further said that it takes more steam to go up grade and that when the engine had been standing and then starts suddenly it makes a loud puffing, an extraordinary noise and that if you had the cylinder cocks open it would make a kind of hissing noise, an extra noise.

Alice McCoy, called for plaintiff, did not see the accident but she had seen the engine many times before in front of her house and had heard it "whistle"—"it sounded to me like a whistle."

Catherine Dulard on plaintiff's behalf testified that she heard a "whistle" on the roller when it would be back and forth on Laclede. She heard it "dozens of times." The neighborhood boys would "jump up and blow it." The whistles were loud and shrill. She heard them at all times of the day. On cross-examination she said: "I heard a sound which was like a whistle . . . that sounded exactly like a steam whistle."

Adam Brehn did not see the accident but testified that he "heard whistles" on the rollers in use and heard one on the big roller. He had never examined the engines to see whether they had whistles but said: "I know I heard sounds from one or the other that sounded like a whistle. I heard the whistle blown on the large one."

Robert J. Carroll on behalf of plaintiff gave evidence tending to show that the roller had a whistle. "I think the roller had a whistle on it; am satisfied it did." His own horse "was scared at the roller

227 Sup—44

whistle." On cross-examination he testified that he could not be mistaken on the whistle sound. "I am quite familiar with them, it was a whistle sound." The children in the neighborhood at times would blow the roller whistle.

Another witness, Harry Shobby, a school boy, was buying candy in a drug store close by. He did not see the accident but before it happened . "Heard the whistle blow, one of them steam whistles . . . I heard the whistle two or three times; it was very loud."

At a former trial Peter F. Murray, the engineer in charge of the roller, had testified on behalf of defendant. At the present trial the plaintiff concluded to use his evidence and thereby make him his witness. Thereat he read the testimony given by Murray at the former trial. It runs in substance as follows: Witness had been continuously rolling the finishing coat of dry granite screenings back and forth for about three-fourths of an hour before the accident. "A roller engineer," he said, "is always on the lookout for accidents"—meaning thereby, we infer, to fix his *status* as an observer. Continuing, he said he saw the accident. Was running the roller east, was facing north as a person with a roller would, "faced to the north and looking east." "As I was running east I saw this laundry wagon in the west-bound track. As the horse approached the roller he pulled out of the track." The horse did not appear "excited" and witness did not notice the driver particularly. As the horse pulled out of the track, "he increased his pace slightly," ran over the screenings, and hit the screening cart. According to the judgment of Murray, "the horse was not running away until he hit the handles of the screening cart and then he gave a couple of plunges," and the witness stopped the roller instantly then. He got off of the roller during this instant and the horse ran down the curb, turned the wagon over

and fell down. Witness went to the wagon and helped the driver out. In answer to a question from the court the witness said: "I saw when it was being frightened. He was about thirty or forty feet away. The horse left the car track and he hit the screening cart and became frightened." The court then inquired as follows: Q. "The horse was not frightened before that?" The witness replied: "It was not noticeable to me." Continuing, he said the horse turned out of the car track and swerved to the pile of screenings and hit the cart and struck the curb. The engine was stopped about the time it hit the cart. The whole affair only lasted about one-half a minute. The roller had no whistle, never had any kind of a whistle. The only noise was the exhaust or the puffing and the rattling of the machinery . . . "the puffing was just as it always was all day long."

On cross-examination this witness explained his position at the time as follows: "I was facing north, looking east; had been looking in that direction probably a couple of minutes or one minute. My roller was moving east. During that time I moved east. During that time I moved fifty or sixty feet." First saw the horse coming down Laclede avenue about one hundred and fifty or two hundred feet away. When witness first saw the horse was frightened it was about even with him. He had not been frightened until he hit the cart and he fell ten or fifteen feet from the cart. There was no unusual noise made by the roller. "It was a very ordinary puffing" and the horse left the car tracks while the puffing was going on. On being inquired of as to his eyesight witness replied that he was supposed to have normal sight with glasses on. "I have worn glasses since I was twelve years old. The cause of my trouble was typhoid fever. My eyes have been weak ever since."

Such was plaintiff's case on the facts.

On behalf of defendant, Buntin, its general manager testified that the roller in question was called the Universal Roller and was manufactured by Julian Scholl and Co., N. Y. Defendant owned two of them, neither of them was equipped with steam whistles. They were bought in 1904. Defendant had two rollers on the work on October 3, but they were worked with different crews. Witness did not see the accident.

D. F. Hogan was defendant's superintendent. He identified the roller used by Peter Murray as a Universal Roller. There was no whistle on either of the Universal Rollers owned by defendant. The witness was an engineer and had operated engines—stationary and locomotive. He was familiar with the noises the Universal Roller makes when working. It is the familiar sound of the exhaust of a locomotive working under tonnage. You can hear the noise a good distance, a puffing noise made when the engine is working. Up-grade requires more power and the exhaust is louder. Besides the exhaust noise coming from the stack, there is a pop valve, that is, the gauge is set at a lawful amount of steam for the engine to carry and the pop valve is set to balance with that. When the pop valve goes up it makes a sharp noise like steam having suddenly lifted the lid off the pressure. Witness knew nothing about the accident. This engine had no whistle on it. If one had been put on and taken off it would show.

James Cunningham, a superintendent of a machinery company doing defendant's repairing, knew the roller. It had been in the shop and had no whistle on it. It had a pop valve that pops and goes off and relieves the pressure quickly. Witness was not present at the accident.

Mr. Worther, a machinist working for Cunningham's machinery company, testified that the engine had been in the shop. He had thoroughly examined it. It was not equipped with a steam whistle. If one had

been on it and been taken off it would leave marks to indicate that fact. There was no such indication on the engine. Witness did not see the accident.

Mr. Paul, another machinist working for Cunningham's company, had seen the engine in the shop and examined it for a whistle attachment. There was no place on it for a steam whistle and it never had a whistle attachment.

The defendant next read the testimony of Mr. Leighton, secretary of Julian Scholl and Co., manufacturers of road-making machinery. He testified to defendant's buying two Universal Rollers and that his firm never supplied whistles with their steam rollers and there were no whistles to them when shipped. Witness was positive as to that. If whistles were put on it would be through an order from his office and no such order was issued. In the Universal Roller the steam from the cylinders is exhausted in the smokestack and makes a puffing sound when the roller is in operation. The only noise that could come from the roller when not in operation would be through the safety valve.

Samuel R. Murray was called for defendant and testified as follows, in substance. He was in charge of the job for defendant, saw the accident, was standing about 225 feet west of Spring avenue, was looking at plaintiff's horse and the roller at the time. The lines were loose over the horse's back as he approached the roller. When he got about 150 feet west of Spring avenue the horse became frightened at the roller and increased his pace but was still trotting. "There was no running away." As the horse increased his pace he was then in the car track and either swerved or pulled to the right and ran into the screenings cart. That was what frightened him "more than anything else." He began plunging then along the curb about twenty-five feet. "As soon as the horse became frightened and struck the screenings cart the roller engineer

immediately stopped his roller and ran to the man's assistance." Witness was familiar with the roller, had been a roller engineer for twelve years and examined it thoroughly. There was no whistle on it. In its ordinary operation the roller "would make a noise similar to a hoisting machine in pulling up this grade." Down grade it would not make very much noise, only the rattling of the gear; going up it would make a puffing or exhaust noise. The roller had been in operation at least twenty minutes continually before the accident occurred. It had just run down to the west and was pulling up the hill east when the horse became frightened at the exhaust. The lines were slack when witness first noticed plaintiff and he either failed to get hold of both lines or only had hold of one. He did not control his horse and had it been under control the accident would not have happened.

On cross-examination he stated that the lines were loose when the horse began to veer off the track, that the horse was frightened when he hit the screenings cart and was not running away until he struck it, that the puffing noise ceased as soon as the horse began to veer from the car and the engine was running until that time. Witness was sixty feet from the wagon when he first noticed the lines were loose and slack over the horse's hips. Did not see the driver's hands.

Walter Carter testified for defendant. At the time of the accident he was on the street in defendant's employ using the cart to sprinkle screenings on the street. Witness was standing against his cart when Mr. Phelan drove in and struck it. Witness had been facing east and saw the laundry wagon about one hundred yards or less away and "hollered" at Phelan. Phelan was looking at that time at a little book or something in his hand. He was not holding the lines but they were fastened up in the top of the wagon. When he "hollered" at him he grasped the lines, grasped one, the right hand line. At that time the

horse was coming at a moderate rate near the center of the street on the same side witness was on. When Phelan grabbed the right hand line he hit the car. The horse jumped and slipped on the curb making about two leaps, ten or fifteen feet to the best of the knowledge of the witness. Prior to striking the cart the horse had not given any indication of being frightened at anything. Witness was familiar with the roller and knew there was no whistle upon it. He was familiar with all four of the rollers used by defendant. The only one that had a whistle was a little asphalt roller used in patching. Phelan took hold of the line after the witness yelled at him and the object of yelling was to keep him from striking the cart. The engine makes a pretty loud puffing noise in going up hill. (Note— It was going up hill at the time of the accident.) Murray didn't stop his engine until the horse was down.

Mr. Taussig, an employee of the street department of St. Louis, educated at the Harvard University and at the Missouri School of Mines (presumably in engineering), and who had personal charge of the reconstruction of the street in so far as the interest of the city was concerned in having the contractor live up to his contract, was called for defendant. He testified to many signs put up along Laclede avenue to warn the people of holes and excavations and of the process of reconstruction. There were barriers on the south side of the street but the north side was open for any one to use. The north side was also being used by the contractor by placing screenings on it. The witness was present at the accident. Peter Murray was using a Universal Roller. Witness was familiar with it. It had no steam whistle he ever saw or heard. On level ground there was an ordinary puffing noise while in ordinary operation, such as a locomotive makes when going along without any big load. If it goes up grade it is equivalent to being under a heavy load and

the effect is to make the noise of the exhaust greater. Houses on either side of the street have a sounding-board effect and make the noise louder than in the open. When there was excess of steam it escaped through the pop valve, and the noise made through that valve might be mistaken for a whistle by people not familiar with an engine. Witness was within eight feet of the roller and between the screenings and cart and the roller at the time. The first thing attracting the witness's attention to Phelan and his horse was the rattling sound of his wagon wheels grinding on the car track and sliding and trying to get off. As witness was standing on the track he didn't "know what was going to happen." He saw the horse was trotting down hill about thirty or forty feet away and going to the north side of the street. He heard a yell from the colored men at the push cart, and apparently Phelan was going over these boys and they jumped out of the way. The wagon struck the cart as the horse veered in closer to the curb, and the wagon was sliding along the curb when it upset about twenty-five feet on the other side of the cart. The horse had the appearance of being frightened and running away "just after he hit this cart" and when the cart upset. Before the horse struck the cart he was going at a medium trot. Witness did not notice that he was scared at the roller at that time and was rearing and surging on the street. On cross-examination he was asked: Q. "You don't know whether it had a whistle on it or not?" And replied: "I know as well as I know you have hair."

Such was the substance of oral testimony on behalf of defendant so far as material to any issue here.

Defendant then read in evidence section 912 of chapter 12, article 2, of the general ordinances of the city of St. Louis relating to the construction and repairing of streets. That section appears hitherto

herein in the copy of the notice posted on the barricade.

Plaintiff asked and, over the objection of defendant and exception saved, was given five instructions, as follows:

"1.    The court instructs you that, if you find from the evidence that plaintiff was driving a one-horse wagon at the place on Laclede avenue mentioned in the evidence, and that the agents of the defendant in charge of a certain steam street-roller, mentioned in the evidence, ran and operated the said steam street-roller so that it made puffing or whistling noises, that the horse of the plaintiff as a result of the running, puffing or whistling of said steam street-roller became unmanageable, and placed plaintiff in a position of peril, and said horse ran away and caused the injuries to the plaintiff complained of, and you further find from the evidence that the agent of the defendant, in charge of and operating said steam roller, saw that plaintiff's horse was becoming frightened at said steam roller and noises, and was becoming unmanageable, and running away, and that the plaintiff was being placed in a position of peril, in time to have stopped the running of said steam street-roller, and stopped the puffing or whistling noises of the said steam street-roller and prevented the plaintiff's horse from becoming unmanageable and running away, and the injuries to plaintiff complained of, by the exercise of ordinary care on his said agent's part, and, if you further find that he negligently failed to do so, then defendant was guilty of negligence, and, if you find that the plaintiff's injuries were caused by the said negligence of the defendant, then your verdict should be for the plaintiff, unless you further find from the evidence that there was negligence on the plaintiff's part directly contributing to the injuries sustained by him.

"2.    But the court further instructs you that if you find from all of the evidence in this case that the

plaintiff's horse became frightened after and as a result of running into the screenings or crushed granite mentioned in the evidence, and not by reason of the negligence of the defendant's agent and servant, then your verdict should be for the defendant.

"3. The court instructs you that, although you find from the evidence that plaintiff was driving a partially blind horse on the occasion mentioned in the evidence, and that although you find from the evidence that the harness or parts of the harness on plaintiff's horse were insufficient and gave away on the occasion mentioned in the evidence, yet neither of these facts, if you find them to be true, would prevent plaintiff from recovering in this action, unless you further find from the evidence that such fact or facts directly contributed to cause the injuries complained of in this case.

"4. What constitutes 'ordinary care' as mentioned in these instructions depends upon the facts of each particular case. It is such care as a person of ordinary prudence would exercise (according to the usual and general experience of mankind) in the same situation and circumstances as those of the person or persons in this case with reference to whom the term 'ordinary care' is used in these instructions. The omission of such care is negligence in the sense in which that word is used in these instructions.

"5. The court instructs the jury that, with respect to the charge of contributory negligence on part of plaintiff, the burden of proof is on the defendant, and unless the defendant has proven to the satisfaction of the jury by a preponderance of all the evidence that plaintiff was negligent, and that such negligence directly contributed to the injury complained of, they should not find him guilty of contributory negligence."

Defendant was given seven instructions as follows:

"1. The court instructs the jury that there is no allegation of negligence in this case based upon the pile of screenings or cart at the place in question, and you will not be at liberty to base any verdict upon the fact that such material was there at the time in question.

"2. The court instructs the jury that if you find from the evidence that the direct and proximate cause of the injury to plaintiff was the fact that the horse he was driving swerved and allowed the wagon he was drawing to strike the push cart of the defendant, then your verdict should be for the defendant.

"3. If the jury believe from the evidence that plaintiff's horse was practically blind, and that plaintiff's act in driving a practically blind horse near and by a steam roller in operation was negligent, and that such negligence directly contributed to the accident, then their verdict will be for the defendant.

"4. If the jury believe from the evidence that the injury to the plaintiff was caused by the joint, mutual and concurring negligence of plaintiff and defendant's agent in charge of the roller, and that the negligence of neither, without the concurrence of the negligence of the other, would have caused said injury, then the plaintiff is not entitled to recover, and their verdict must be for the defendant.

"5. If the jury believe from the evidence that plaintiff's horse was defectively or improperly harnessed, and that plaintiff's act in driving a horse that was defectively or improperly harnessed near and by a steam roller in operation was negligent, and that such negligence directly contributed to the accident, then their verdict will be for the defendant.

"6. The court instructs the jury that the defendant had the legal right to operate the steam roller in question at the time and place in question, in the usual and ordinary manner, and that plaintiff, in enter-

ing and driving along said streets did so subject to said right of the defendant.

"7.    The court instructs the jury that the term negligence as used in the instructions, means that the party guilty thereof has done something which a reasonably prudent man, under the circumstances, would not have done, or failed to do something which a reasonably prudent man, under the circumstances, would have done."

Defendant asked six instructions which were refused and timely exceptions saved to the ruling of the court on that behalf, *viz.*:

"1.    The court instructs the jury that there is no evidence before you that the puffing made by the steam roller in question was in any respect unusual, and you are further instructed that if you find from the evidence that the steam roller in question was not equipped with a steam whistle, then your verdict should be for the defendant.

"2.    If the jury believe from the evidence that the place to which plaintiff was intending to go at the time of the accident in question, was a point on Laclede avenue west of Vandeventer avenue, and that there was a perfectly safe route for plaintiff to go to said destination by using other open streets, and that there was some danger in driving over Laclede avenue between Spring avenue on the east and Vandeventer avenue on the west while the work of reconstruction of said Laclede avenue was in progress, and while a steam roller was in operation, then if plaintiff voluntarily, and without any necessity therefor, chose the route which was attended with danger instead of that which was entirely safe, he was guilty of contributory negligence directly contributing to his injury, and the verdict must be for the defendant.

"3.    If the jury believe from the evidence that plaintiff started on the morning of his accident to drive to a point on Laclede avenue west of Vande-

venter avenue, and that there was a perfectly safe route by which he could have reached his destination as conveniently as by going over Laclede avenue at the point where the steam roller in question was being operated, then if plaintiff chose to go to his said destination by Laclede avenue instead of by some other equally convenient route, your verdict will be for the defendant.

"4. If the jury believe from the evidence that section 912 of the general ordinances of the city of St. Louis which has been read in evidence, was in force on the day of plaintiff's accident, and that there was a notice on Laclede avenue at or near Spring avenue that said Laclede avenue had been temporarily withdrawn from public use, then defendant had no right to drive or attempt to drive along Laclede avenue west of Spring avenue, for the purpose of reaching a point west of Vendeventer avenue, and your verdict should be for the defendant.

"5. The court instructs the jury that one who voluntarily, knowingly and consciously incurs a danger which there is no necessity for incurring and which can easily and readily be obviated, takes the risk of such danger upon himself; and if you believe from the evidence in this case that plaintiff voluntarily, knowingly and consciously drove his partially blind horse by the steam roller at the time and place in question, without any necessity therefor, and when he could have easily and readily taken another road and obviated whatever danger, if any, there was in attempting to drive by said steam roller, then he must be held to have assumed the risk of such attempt, and for any injuries directly sustained as the result of such attempt, he cannot recover herein.

"6. The court instructs the jury that when a party to a suit introduces a witness to testify on his behalf he vouches for the truth of his testimony and is not allowed to impeach such witness."

Once before in the Court of Appeals (115 Mo. App. 423) on remanding, the second verdict was of a size to give this court jurisdiction. The divergent views on the facts and the insistence of appellant's learned counsel, at bar In Banc, that the facts were misconceived in Division, called for a full statement, even at the expense of brevity. The facts have been set forth whenever practicable (having regard to a summary) in the language of the witnesses.

I. It is assigned for error that the verdict is excessive. We are pointed to the fact that it is for the full amount prayed in the petition, and it is argued that such coincidence indicates passion and prejudice. But before we follow the lead of that argument, we would have to assume that petitions always lay damages so excessively as to indicate passion and prejudice. We might take judicial notice of the pleader's zeal for his client, and that such zeal prompts or provokes allegations to the verge as the facts allow. We might (now and then) even suspect a tendency to inadvertent over-statement, but we can hardly announce as a proposition of law that if the verdict of a jury responds fully to the relief asked it is evidence of passion, prejudice or a welter of mere sentimental emotion and effervescence.

The eye is a main member of the body. Its loss was always a tender point with men and their laws. A man blind of an eye is disfigured, oppressed, humiliated and under a shadow, once for all handicapped. It is argued that plaintiff lost little time, and at the trial was receiving the same wages, as the driver of a laundry wagon, that he earned before his injury. But is plaintiff to be doomed to always drive a laundry wagon? Are those avocations requiring two eyes and a comely countenance to be quite closed to him? Laying no stress on his minor injuries, yet his pain and loss were great, and though his damages be high we cannot allow them to be so high as to bespeak passion and

prejudice and coerce judicial interference. [Shaw v. Railroad, 123 Mich. 629.] It was suggested to counsel from the bench that it was not worth while to argue that assignment of error. As we felt then, so we feel now.

The point is ruled against appellant.

II. It is assigned for error that the court admitted improper testimony concerning the public use of the north half of Laclede avenue between Grand and Vandeventer. We deem the position untenable. Defendant's answer admits the north half was open for modified public use, *viz.,* for "the entrance of persons having business upon said street." The south half was alone barricaded and posted. An official of the city was on the ground and the most favorable view possible to defendant is that the city closed the south half of the avenue and threw the north half open to general travel as a thoroughfare. Certain it is that the general use made by the public at the time and before was under the eye and by the acquiescence of both the city and defendant. There was no such limitation as outlined in the answer put upon the travel. The tide of it flowed free and full. The opening of the north half and the absence of barricades there, were tantamount to an invitation to public use (*sub modo,* as presently seen) and we cannot blink the fact that neither the defendant nor the city lifted a finger by way of protest to such public use of the north half. Such use and the extent of it bear on plaintiff's contributory negligence precisely as it would have been competent to show, if possible, that no one was permitted to use it, or only used it furtively or by force of numbers over the protest of those in charge.

This point is also ruled against appellant.

With these preliminary matters at rest, we reach the main assignments of error, *viz.,* in overruling the demurrer to the evidence and in giving and refusing instructions.

III. *Of the demurrers.* At the close of plaintiff's evidence defendant demurred and again at the close of the case. The two may be treated as one, to be ruled in the light of the evidence on both sides. This, because when defendant refused to stand on its first demurrer but put in its own case, it took the chance of strengthening plaintiff's. Under this record we deem it a waste of time to consider them separately.

In disposing of a demurrer to the evidence it is an unbending rule that defendant's evidence, contradicting plaintiff's, fills no office; that plaintiff is entitled to have his evidence taken as true and the contradictory evidence of defendant taken as untrue; and is allowed every reasonable and favorable inference of fact naturally deducible from his own or the uncontradicted testimony of defendant. [Holloway v. Kansas City, 184 Mo. 19; Klockenbrink v. Railroad, 172 Mo. 678; Mockowik v. Railroad, 196 Mo. 550.] Measured by that rule, if there be found any substantial evidence sustaining the essential averments of the petition the demurrers were well ruled.

We have come to the conclusion there was no error in that regard. This, because:

(a)   A town in Missouri is charged with the duty of keeping its streets in order and is liable to travelers for street defects negligently permitted. It follows that such town has the inherent right to reconstruct and repair its streets and (for the purposes of repair or reconstruction) may totally or partially interrupt their present use by the public. In such case the use of the street to rebuild it, becomes a use paramount to the public use for travel.

What the city of St. Louis could itself do in reconstructing a street it could do by another, and this case proceeds on the theory that the city of St. Louis was reconstructing Laclede avenue through defendant as a contractor. Absent testimony to the contrary (as

here), several presumptions flow from that theory and apply to the facts of this record:

First, that such reconstruction was proper.

Second, that defendant with its work, its men, material, steam roller and other appliances with usual, non-negligent noises was in the street for a lawful purpose—said noises not confined to one-half of the street but filling it all from side to side, the houses on either side acting as a sounding board. (So, the frightening physical aspect of the steam roller, the heap of screenings and the push cart, all lawfully there, were visible from side to side and end to end.)

Third, that the south half of the street was properly closed and the north half properly thrown open for use—that is, absent testimony on who opened the one or closed the other, both acts are presumed to have been rightfully done.

But it would be unreasonable to rule that the public were invited to use the north half of the street as in all respects entirely safe and convenient—that is, as free from dangers as an ordinary public street. [District of Columbia v. Moulton, 182 U. S. 576; Township of Crescent v. Anderson, 114 Pa. St. 643; Lane v. Lewiston, 91 Me. 292; Cairncross v. Pewaukee, 78 Wis. 66; Haller v. St. Louis, 176 Mo. 606.] Any one driving along there in daylight could see that the south half was in process of reconstruction, was barricaded, that steam rollers were in operation, and that the north half was in use to store material and appliances used in reconstructing the other half. Plaintiff saw all these things. He saw, furthermore, that of the fifteen feet between the curb and the street railway tracks six of them were occupied by a heap of screenings with a push cart adjacent. If we should hold that the work of reconstruction with its ordinary and usual attendant noises should stop every time a traveler headed that way and undertook the ticklish adventure of driv-

227 Sup—45

ing down the north half, reconstruction and repair would be out of the question in a great city like St. Louis; for it would be constantly broken by a stream of interruption. Therefore, while plaintiff under the invitation extended by the open half of the street and the permissive use by the public of that half was entitled to go down there, yet his invitation had its limitations and warnings based on physical facts apparent to him, that is, if he preferred to experiment, to test or *coquet* with the danger, take his chance of reconstruction going on during his passage with all its attendant, usual and non-negligent noises, rather than go round by Pine street, he was at liberty to do so with the horse he was driving.

Speaking of that horse, by a compensatory law of nature if one sense is lost the others become more acute through extra use in supplying the deficiency. So, the ear of a blind man or a blind horse measurably fills the office of both eye and ear and becomes more sensitive to sounds. A horse blind of one eye and seeing but dimly with the other sees all he does see abnormally and out of true proportion; therefore, he is disturbed more easily than one with good eyes. So that this plaintiff (himself with good eyes) must bear the burden not only incident to the street reconstruction and the chance of the usual attendant noises and dangers of the steam roller, but that of knowingly going down Laclede avenue with a horse minus some of those faculties likely to lead up to hard "horse-sense."

If, under circumstances just outlined, plaintiff saw fit to test the danger of travelling on Laclede avenue, and his horse, such as it was, became frightened at the sight of, or at a necessary, usual or ordinary noise in operating, the steam roller, and through such fright ran away and hurt plaintiff, he assumed the risk of such fright and injury. Such dangers were open and obvious to him; if hurt by them he has no one to blame but himself. To allow a plaintiff to recover un-

der such circumstances would be to allow a recovery for an injury from known and open danger voluntarily encountered. It would be but levying tribute on the performance of a lawful thing in a lawful way by defendant, *viz.*, the reconstruction of the street. If that were all there is to plaintiff's case, the demurrer should have been sustained. But that is not all as will presently appear.

(b) No man assumes the risk of another's negligence. Merely because defendant was lawfully in the street and was rightfully using the necessary means to a lawful end, to-wit, the movement of a heavy steam roller with its attendant noises to rebuild it, we know of no rule of law that exempts it from liability for injuries received by a traveler on the highway as the result of its negligent performance of its work.

It is argued that there can be no negligence unless there was a duty and that in this case defendant owed plaintiff no duty. It is axiomatic that a duty and a breach of it are conditions precedent to actionable negligence. If there was no duty there could be no breach, *ergo,* no negligence (*damnum absque injuria*). But defendant owed plaintiff a duty. Though the latter was handicapped by certain risks he assumed, yet he was still a traveler on a public street and defendant, though rightfully at work there, owed him due care. We are willing to allow defendant the proposition that it did not have to stop its street work in the first instance when plaintiff entered upon the street, but we are not willing to allow to it the proposition that it can escape liability if it performed its work so negligently as to injure plaintiff; nor are we willing to allow to it the other proposition that if the usual noises of the street roller caused plaintiff's horse to become restive and shy off, and to act as if becoming unmanageable, and such condition of things became apparent to defendant's engineer, he could voluntarily continue the noises thereafter and

thereby put the horse in a panic, beyond control, cause it to run away and injure its driver.

On this phase of the case more than one proposition arises. For instance:

There was testimony tending to show that the horse took fright at a usual noise incident to the operation of the roller and ran away because of that initial fright. On that view of the case, defendant was entitled to an instruction that if the jury found the facts that way, there could be no recovery. It asked no instruction of that sort.

Again, there was testimony tending to show that the horse took fright from the unusual, unnecessary and negligent use of a steam whistle on the roller. There certainly was evidence that the roller had a steam whistle and that it was in operation when plaintiff's horse took fright. *Contra,* there was evidence there was no steam whistle blown. Indeed, there was cogent testimony in the nature of an *alibi, viz.,* that the roller was not equipped with one and never had been. It may be allowed to defendant that the weight of its testimony on this score preponderates. It is likely that plaintiff's witnesses mistook the puffing noises, the exhaust, incident to running the roller up grade for the whistling of a steam whistle. Defendant could have put that theory to the jury if it had desired an instruction on it. But there is no evidence and no claim that the use of a steam whistle, as such, was necessary in running the roller at the time. If one was used, its use was negligent. That the unnecessary use of a steam whistle close to travelers on a highway whereby horses are frightened and human beings injured is actionable negligence, is a proposition supported by principles of natural justice and by precedent. [Feeney v. Railroad, 123 Mo. App. l. c. 429; Brown v. Railroad, 89 Mo. App. 192, and authorities cited; Flynn v. Railroad, 169 Mass. 305.] The demurrer should have been overruled on this ground, if no other.

Again, eliminating the whistle, there was testimony tending to show that the puffing noises were extraordinary in volume and unusual. If this testimony is to be believed, it was negligence to carry on its work in that way when travelers in vehicles were journeying hard by on the other half of the highway. Such terrifying noises differ only in kind from the unnecessary use of a steam whistle. The same rule of law applies to both.

It is asserted there was no evidence the noises were "unusual." But counsel are inadvertently mistaken. Witnesses were allowed to say without objection more than once that the noises were extraordinary and unusual. It may be if these witnesses had been closely sifted on cross-examination it would have been made apparent that they were not competent to speak of "usual" and "unusual," or "ordinary" and "extraordinary" noises in operating a steam roller of that size and build up grade; or that they compared the ordinary noises of the roller with ordinary street noises and thought them extraordinary and unusual from that comparison only; or that they never saw or heard another steam roller of the size and character in question in operation and therefore had no experience or observation making their judgment worth a rush. But it was for defendant to have developed these facts in cross-examination, if it chose. We shall not assume it so. The testimony was in for what it was worth. A defendant cannot stand by and allow evidence to go in of the character indicated without objection or without attempt to break its force by cross-examination and rest on a court of review ruling there was no testimony at all.

On the record plaintiff was entitled to go to the jury on the proposition that defendant operated its roller with unusual, extraordinary and, therefore, negligent noises, and if the fright and runaway were occa-

sioned thereby he might recover. The demurrer was properly overruled on this score.

Again, on the hypothesis the noises were usual. There was testimony that, after the horse gave signs of taking fright at the noises made by the approaching roller, these same noises were continued until he became unmanageable and the catastrophe resulted. If, now, defendant's engineer saw the initial signs of fright and uneasiness in the horse and, giving no heed to them, continued the original cause of the fright until the horse broke entirely away from control, *i. e.*, if the runaway was caused by such *continuation* of the noises, then defendant was liable though the continued noises were usual. The case in this aspect is the same as if one is in peril and another, seeing his peril, omits to save him when within his power. It is but the humanitarian rule in one of its forms. [Oates v. Railroad, 168 Mo. 535; O'Donnell v. O'Neill, 130 Mo. App. 360.]

It is argued for appellant that there was no testimony tending to show the engineer saw the horse was taking fright and continued the noises after that time. It is true he locates the running away and observable fright of the horse at the time the horse ran into the cart or the screenings. His testimony shows he stopped the noises then, and if his word in that one particular is alone to control, the plaintiff has no case on this phase of it. But the same engineer also testified to some other things of marked significance. Thus: he puts himself facing east. He says it was his duty to look out for people and that he was looking out east as he went in that direction. We have been unable to read his testimony and draw any other conclusion than that he wants it understood that he saw the horse away to the east of him, that he saw it leave the rails and veer off to the curb—keeping it always under his eye; in short, that he saw all there was to see. He must, then, have seen what others saw, and others saw this horse taking fright to the east of the engineer as the

roller was heading that way, and fifty, sixty or more feet away.

That plaintiff read to the jury testimony of the engineer as part of his case does not bind him to the engineer's judgment and conclusions or all his statements of fact, as argued by defendant's counsel. Having used the engineer's testimony as his own, plaintiff was precluded from showing he was unworthy of belief, *i.e.,* from impeaching him. A litigant may not blow hot and blow cold that way. It is a sad bird that befouls its own nest, as the adage runs. Having vouched for the character of the witness by the act of offering him, he must abide it. But the object of a lawsuit is to get at justice by elicting the truth, and plaintiff may show the facts by other witnesses, although such facts contradict his own witness and *incidentally* or *indirectly* hurt his credit. [Jones on Ev. (2 Ed.), sec. 857, 858; State v. Shapiro, 216 Mo. 359; Knorpp v. Wagner, 195 Mo. 660.] The demurrer was rightly disallowed, on the theory just discussed.

(c) Counsel argue that plaintiff was violating a law and, therefore (as a matter of law), cannot recover. This argument travels on the theory that plaintiff was violating the ordinance in going down a closed and posted street and that such violation was the direct and proximate cause of the injury. We cannot allow the argument sound. In the first place plaintiff was not violating the law. The north half of the street was open for use if travelers were willing to take the risk of street reconstruction pursued without negligence. In the second place if plaintiff was violating the law, such violation was not the proximate and direct cause of the injury. There are cases where a plaintiff is injured while committing a crime *malum in se.* Such cases are not in point here. There are cases where a violation of a command of the master or of the law is the proximate cause of the injury and such violation becomes contributory negligence as a matter of law.

For instance, the violation of a speed ordinance by a plaintiff may be the cause of a collision. [Weller v. Railroad, 120 Mo. l. c. 654 *et seq.*] But the case before us (if we allow there was a violation of the law) makes that violation only an "attendant circumstance" or "condition" of the accident, not a causal factor of it. In a broad and loose sense, if plaintiff had not lived in St. Louis, or had not been the driver of a laundry wagon, or had not gone down Laclede avenue, he would not have been hurt. But none of these things, each on a par with the other, were the proximate cause of his injuries. An instructive case illustrating the proposition now up is discussed by counsel on both sides, Newcomb v. Boston Protective Dept., 146 Mass. 596 (*q. v.*). There plaintiff, a cabman, instead of ranging his horse and cab lengthwise with the street and along the curb while on his stand, ranged it otherwise and was injured by a collision.

Our case, on this phase of it, is on principle akin to a man walking on a railroad track in violation of our statute against trespassing on such track. In such cases we have uniformly ruled that a human being committing such trespass in violation of express statute may not be injured with impunity where his peril was seen by those operating the dangerous instrumentality (or, under some circumstances, might have been seen) in time to avert his injury. [Morgan v. Railroad, 159 Mo. l. c. 276; Ahnefeld v. Railroad, 212 Mo. 280; Frye v. Railroad, 200 Mo. l. c. 399; Cotner v. Railroad, 220 Mo. l. c. 309.]

(d)  In further discussing the demurrer stress is put on the fact that plaintiff voluntarily chose a dangerous way when Pine street (with no danger) was open and convenient to him. It is sought to apply the principle that when there are two open ways of doing a thing, one dangerous and the other not, and a plaintiff chooses the dangerous way and is injured, no recovery lies—that contributory negligence is predicated,

as a matter of law, of such fact. But that principle only applies where there are two ways of doing the very thing that caused the injury. An application of the doctrine may be found in Black v. Railroad, 172 Mo. l. c. 188. Here we have already ruled that choosing Laclede avenue instead of Pine street was not the proximate cause of the injury. The actionable injury, if any, was caused by the negligence of defendant *after* plaintiff entered on the street, and contributory negligence defeating recovery must also relate to the acts of plaintiff after he entered on the street—they must relate to each other in order to meet and offset each other. But we have pursued the matter far.

Other phases are discussed in this behalf, but we have disposed of material propositions and hold the demurrer bad.

IV. *Of the giving of instructions for plaintiff.* Plaintiff's first instruction was a general one intended to outline the whole case and should have been drawn with precision, simplicity and circumspection, keeping in mind the several and varying phases of the case and grounds of recovery; this in order to prevent confusion in the minds of the jury. The justness of this observation is reinforced when we consider the closeness of the case on its main features and the fact that the verdict is a good round sum.

Plaintiff was entitled to an instruction properly drawn to the effect that if the jury found and believed from the evidence that defendant negligently blew a steam whistle in its work in reconstructing Laclede avenue and that said steam whistle, so negligently blown, frightened plaintiff's horse and caused him to run away, etc., then plaintiff could recover in the absence of his contributory negligence.

He was also entitled to one based on the theory that if there was no steam whistle blown, but that defendant then and there negligently operated its steam roller by emitting unusually loud and frightening

noises, strictly limiting them to noises not necessary or incidental to the operation of such steam roller, and thereby frightened plaintiff's horse and caused it to run away, etc., then, in the absence of contributory negligence, he could recover.

He was also entitled to an instruction to the effect that if defendant was operating its steam roller with usual puffing noises and such noises caused plaintiff's horse to shy and to act as if becoming unmanageable, if the noises of the approaching roller be continued, and if such fact became apparent to defendant's engineer, then it was his duty to stop the roller and cease the noises; and if thereafter in violation of that duty he did not stop the roller and cease the noises but continued them and such *continuation* of said noises put plaintiff's horse into a panic and caused it to run away, then, in the absence of his contributory negligence, plaintiff was entitled to recover.

Now the instruction either smacked of, or embodies in whole or in part, all said several phases except possibly that involving the idea of unusual or extraordinary noises. In omitting that phase plaintiff did not follow the lines of his petition which counts on "unusual puffing and frightening noises" and on "unusual and frightening noises." Again, the instruction is so drawn that *puffing* and *whistling* are put on a par in causing the horse to take fright at the outset. We think that unfortunate, as there is a marked distinction between the two—the one might be a necessary and ordinary noise and the other an unnecessary and negligent one. Again, the instruction is so drawn that the jury might be misled into the idea that if the horse became unmanageable at the outset from the puffing (though ordinary and necessary) the defendant was in some way blamable. In the discussion of this case on the demurrer we have pointed out that plaintiff took his chance of his horse taking fright and running away because of an ordinary and necessary noise in puffing

in the running of the roller and that defendant on that
phase of the case would only be liable if, on becoming
aware of the fact that the horse was taking fright,
its engineer continued the noises and such continua-
tion produced the panic, made the horse unmanageable
and caused it to run away. Vaguely that idea is shad-
owed forth in the latter part of the instruction, but it
is not segregated from other matter calculated to mis-
lead the jury; furthermore, it is not put to them plain-
ly and singly, as it should have been, but is interwoven
with other phases of the case calculated to give the
mind of the jury a twist or bias against defendant. It
was reversible error to give that instruction in that
unfair, complicated and confusing form. We see no
error in any other instructions of plaintiff.

V. *Of the refusing of instructions.* In refusing
instruction one, declaring there was no evidence that
the puffing was in any respect "unusual," the court did
not err. There was evidence on the point pro and con.
The issue was for the jury. It also ignored other phases
of the case: *e. g.,* that involving the humanitarian
doctrine and the *continuation* of usual noises after the
appearance of fright and which may have directly
caused the panic in the horse and the runaway. Re-
fused instruction two declared that the choice of La-
clede avenue with its dangers instead of another safe
street, was contributory negligence as a matter of law;
and if the jury found that plaintiff made choice of the
dangerous street instead of the safe one, he could not
recover. It is not necessary to discuss that instruction.
It amounted to a peremptory order to find for defend-
ant under the facts conceded. What we have already
said in passing on the demurrer indicates our view of it,
It was well refused. The same remarks for like reason
apply to instruction three. By instruction four the
court was asked to rule that if the ordinance relating
to closing streets was in force and if there was a notice
posted (such as shown in evidence) then plaintiff had

no right to drive down Laclede avenue at all and the jury should find for defendant. That phase of the case is considered and disposed of on the demurrer. Refused instructions five and six are likewise disposed of by our observations on the demurrer, and it is no use to say more about them. They were not the law of this case.

The premises considered, the judgment is reversed and the cause remanded for a new trial.

*Burgess, Fox* and *Graves, JJ.,* concur in what is said on plaintiff's first instruction, and in result in separate concurring opinion by *Graves, J. Valliant, C. J., Gantt* and *Woodson, JJ.,* vote for affirmance; therefore they dissent in separate dissenting opinion by *Gantt, J.*

## SEPARATE CONCURRING OPINION.

GRAVES, J.—I fully concur in all that Brother LAMM says as to the instruction condemned by his opinion. However, in my judgment this cause should be reversed outright, but to the end that there may be a disposition of the cause here at this time I consent that it may be reversed and remanded for new trial, reserving the right to pass judgment on the facts and express my views should the case again reach this court and the occasion so demand on the then state of facts.

With the present divided views of the different members of the court, no other course is open to us at this time. As we reverse and remand the cause it is not necessary for me to discuss the facts in the present record.

*Burgess* and *Fox, JJ.,* concur in these views.

## DISSENTING OPINION.

GANTT, J.—I am unable to concur in the opinion of my learned brother LAMM, that this judgment should be reversed and the cause remanded on account of error in giving instruction numbered one.

I fully concur with him that the demurrer to the evidence was properly overruled and that it would have been manifest error to have sustained it, as appears from his opinion. The only substantial difference between his opinion and the views expressed by myself in Division, is that he holds there was error in giving instruction number one by the court, in behalf of plaintiff, and I think that instruction fairly presented the issues to the jury and hence the judgment should be affirmed. This instruction is copied at length in my brother's opinion herein and it need not be reproduced here. The court clearly informed the jury what would constitute negligence on the part of the engineer, to-wit, a failure on his part to stop the running of said roller and the whistling and puffing noises *after he discovered plaintiff's horse was becoming unmanageable*, and especially left it to the jury to find whether he negligently failed to do so. I am unable to see how the jury could have misunderstood this instruction. It submitted the case upon the last chance doctrine and this upon the most favorable view to the defendant. It conceded that defendant had the right to operate its roller in improving the street, but denied it the right after its engineer discovered the peril in which plaintiff had been placed by the fright of his horse at the whistling and puffing of the roller, to *continue* that noise when it could have been instantly stopped with no appreciable loss of time by defendant, and no inconvenience, since in the very nature of things the horse must have otherwise almost instantly passed by. As all of the testimony is fairly set out and all the other propositions fully covered and in my opinion

correctly decided, I deem it unnecessary to do more than enter my respectful dissent to a reversal on account of the giving of the instruction number one for plaintiff.

*Valliant, C. J.,* and *Woodson, J.,* concur in my views.